W. T. BROWN v. ELM CITY LUMBER COMPANY.

(Filed 30 September, 1914.)

1. **Slander—Libel—Communications—Demands—Denials—Latitude—Proof—Trials—Evidence—Nonsuit.**

The purchaser of a car-load of hay, shipped bill of lading attached to draft, paid the draft, received the shipment from the carrier, and then made claim on the seller for shortage of weight, which was refused, and the purchaser put the claim in the hands of his attorneys, who wrote to the seller, and in reply received a letter upon which the purchaser brought this action for libel, saying that the writer had personally superintended the weighing of the hay, that weight was correctly charged, and that it was only a case in which the purchaser "wanted to get $10 allowance on a car of hay." *Held*, more latitude is permitted in communications of this character, in reply to a demand made by the purchaser, and where a failure to answer may furnish evidence of the justness of the claim; and the admissions of the parties showing that the statement complained of was at least partly true, and believed to be so by the defendant, the plaintiff's action cannot be maintained.

2. **Slander — Libel — Qualified Privilege—Malice—Publication—Appeal and Error.**

In this action of slander it is held that defendant's answer to a letter written by the plaintiff's attorney or agent, denying a claim made for shortage in weights of a shipment of hay, etc., is one of qualified privilege, requiring proof of defendant's malice to sustain the action, and the evidence showing that the defendant believed the truth of his statement complained of, the action cannot be maintained. This result will not be disturbed on appeal because of the fact that the trial judge, erroneously holding that the letter to the attorney was not a publication, dismissed the action upon a wrong ground.

APPEAL by plaintiff from *Ferguson, J.,* at April Term, 1914, of PERQUIMANS.

This is an action to recover damages for an alleged libel. The plaintiff and plaintiff's witnesses testified substantially to the following facts: That in October, 1912, the plaintiff purchased from the Elm City Lumber Company, through correspondence with N. E. Mohn, a car-load of hay. That the hay was shipped with bill of lading and draft attached,

and plaintiff had to pay for same, before inspecting or weighing it. That hay was purchased "weight guaranteed." That upon inspecting same, plaintiff found a part of it to be of inferior quality, and also a shortage of 867 pounds in weight. That he thereupon sent a statement to the Elm City Lumber Company, containing various items, all of which were settled, except the plaintiff's claim for shortage, which he sent to Moore & Dunn, attorneys, of New Bern, N. C., for collection. It is admitted in said company's answer that plaintiff's claim for shortage was presented to said company by Moore & Dunn. Whereupon the defendant company, through defendant N. E. Mohn, wrote to said Moore & Dunn the letter upon which this action is based, in words and figures as follows:

MESSRS. MOORE & DUNN, *New Bern, N. C.*

DEAR SIRS:—We have your favor of the 5th, and note your remarks in regard to the claim against us sent you by W. T. Brown of Hertford, N. C. This claim for which Mr. Brown contends is for a difference of weight on car of hay that we shipped this party some time ago. He gave us the weights as he states he received them from the car, whereas both the writer and the party who shipped this car of hay for us tallied the car when it was loaded at Shippensburg, Pa. We wrote Mr. Brown when he made this claim that he must be mistaken in his tally, from the fact that we know that the hay as invoiced to him was absolutely correct. This car was shipped to W. T. Brown last October, when the writer was in Pennsylvania, and personally looked after this shipment. Had this not been the case, we would have then entertained Mr. Brown's claim. It is just a case where we think Mr. Brown wanted to get $10 allowance on a car of hay.

Yours very truly,

ELM CITY LUMBER COMPANY.

Upon receipt of this letter, Moore & Dunn wrote the plaintiff, declining to further prosecute his claim.

The jury found the issues submitted for the plaintiff and returned a verdict for $200. This verdict his Honor set aside, not as a matter of discretion, but as a matter of law, and the plaintiff excepted and appealed.

*P. W. McMullan and Ward & Thompson, for plaintiff.*
*Charles Whedbee and Moore & Dunn, for defendants.*

ALLEN, J. A libel, as applicable to individuals, is a malicious publication expressed either in printing or writing, or by signs, or pictures, tending either to blacken the memory of one dead or the reputation of

one alive, and to expose him to public hatred, contempt, or ridicule. It is any written slander, though merely tending to render the party liable to disgrace, ridicule, or contempt, and it need not impute any definite infamous crime. *Simmons v. Morse,* 51 N. C., 7.

Tested by this rule, there is no libel in the letter written by the agent of the defendant unless it is contained in the last sentence, as all the remaining part of the letter is a statement of facts, couched in respectful language.

The letter was not written voluntarily, but in reply to a demand for payment of a claim, and more latitude is permissible in communications of this character where a failure to answer may furnish some evidence of the justice of the claim.

*Lord Denman,* speaking of a letter written in reply to one refusing payment of rent, said in *Tuson v. Evans,* 12 Adolph and E., 175: "Some remark from the defendant on the refusal to pay the rent was perfectly justifiable, because his silence might have been construed into an acquiescence in that refusal, and so might have prejudiced his case upon any future claim; and the defendant would, therefore, have been privileged in denying the truth of the plaintiff's statement. But, upon consideration, we are of the opinion that the learned judge was quite right in considering the language actually used as not justified by the occasion. Any one, in the transaction of business with another, has a right to use language *bona fide* which is relevant to that business, and which a due regard to his own interest makes necessary, even if it should directly, or by its consequences, be injurious or painful to another; and this is the principle on which privileged communication rests; but defamatory comments on the motives or conduct of the party with whom he is dealing do not fall within that rule. It was enough for the defendant's interest, in the present case, to deny the truth of the plaintiff's assertion. To characterize that assertion as an attempt to defraud, and as mean and dishonest, was wholly unnecessary. This case, therefore, was properly left to the jury; and there will be no rule."

In the construction of publications alleged to be libelous, "The general rule is that words are to be taken in the sense which is most obvious and natural and according to the ideas that they are calculated to convey to those to whom they are addressed. The principle of common sense which now governs in the construction of words requires that courts shall understand them as other people would. The question always is, How would ordinary men naturally understand the language?

"It is not the ingeniously possible construction, but the plainly normal construction, which determines the question of libel or no libel, and in ascertaining whether the words are actionable or not the court will not resort to any technical construction of the language or consider its

grammatical structure, but, instead of measuring the injury by the literal force of the words, will look solely to the meaning which the words were naturally calculated to convey. . . . In determining the actionable quality of words the entire conversation or writing must be considered. In ascertaining the meaning of a particular phrase or sentence it must be construed in connection with the remainder of the publication of which it forms a part. A single phrase, if standing alone or used in a different connection, may be capable of a meaning of which it is not susceptible in the connection in which it is actually used." 18 A. and E. Enc., 974 *et seq.* "The fact that supersensitive persons, with morbid imaginations, may be able by reading between the lines of an article to discover some defamatory meaning therein is not sufficient to make it libelous." *Reid v. Providence Journal Co.,* 20 R. I., 120.

If these rules of construction are applied to the letter in controversy the language may be distorted into a charge of fraud; but considered naturally, the last sentence is nothing but another form of denying liability. The defendant had the right to say he had weighed the hay and there was no shortage, and that therefore he would not pay the claim, and this statement of fact implied dishonesty, if there is any such implication in the letter, as much as the statement in the last sentence to the effect that the writer thought it was just a case where the plaintiff wanted an allowance on a car of hay.

The sentence complained of is strictly true, as both the plaintiff and the defendant agree that the plaintiff did want an allowance upon the car of hay, and the evidence of the plaintiff, if we understand it correctly, tends strongly to prove that at least a part of the claim made against the defendant was unfounded.

The plaintiff testified: "The bill of lading and freight bill for the movement of the shipment showed the weight of the car to be 21,600 pounds, and it was invoiced and paid for by me as 21,495 pounds." And again: "There is usually an allowance of 1 per cent for weights on hay. These weights are guaranteed to be within 1 per cent. I never made any reduction for this 1 per cent; they never asked me. I wrote them a letter in which I stated to them that I weighed the hay myself and after making an allowance of 1 per cent charged them with the balance. As a matter of fact, I never made any such allowance of 1 per cent, and continued to send the statement for shortage of 867 pounds. I did not know of this 1 per cent until after the statement was sent."

If this evidence is true—and the plaintiff cannot complain that it should be acted on, as it is his own—he wrote the defendant that he had made a deduction of 1 per cent, or 216 pounds if calculated according to the bill of lading and freight bill, or 214 pounds if calculated on the

invoice, when he had not done so, and he was making a claim for a shortage of 867 pounds when upon his own showing it ought to have been reduced by 214 or 216 pounds.

In the light of these circumstances and considering the occasion and the letter as a whole, we are of opinion that the plaintiff cannot maintain his action upon his showing.

If, however, the publication was libelous, there is another fatal defect in the plaintiff's case.

It is admitted in the plaintiff's brief, and the authorities all sustain the position, that the occasion of writing the letter by the agent of the defendant was one of qualified privilege, and as was said in *Ramsey v. Cheek,* 109 N. C., 274, "In this class of cases, an action will lie only where the party is guilty of falsehood and express malice. 13 A. and E. Enc., *supra.* Express malice is malice in fact, as distinguished from implied malice, which is raised as a matter of law by the use of words libelous *per se,* when the occasion is not privileged.

"Proof that the words are false is not sufficient evidence of malice unless there is evidence that the defendant knew, at the time of using them, that they were false. *Fountain v. Boodle,* 43 E. C. L., 605; *Odgers, supra,* 275. That the defendant was mistaken in the charges made by him on such confidential or privileged occasion, is, taken alone, no evidence of malice. *Kent v. Bongartz,* 2 Am. St., 870, and cases cited.

"We do not assent to the opposite doctrine which would seem to be laid down by *Pearson, J., in Wakefield v. Smithwick,* 49 N. C., 327, which is not supported by the authority he cites, and, doubtless, intended to follow; for if the words are true, a defendant does not need the protection of privilege. It is when they are false that he claims it. To strip him of such protection there must be falsehood and malice. To hold that falsehood is itself proof of malice in such cases reduces the protection to depend on a presumption of the truth of the charges."

There is in the plaintiff's evidence a total failure of proof of malice, and there is nothing in the record or in the letter which shows or has a tendency to prove that the defendant did not act in good faith and did not believe the statements he made to be true.

We are inclined to disagree with his Honor in the ruling that the sending of the letter to the attorneys of the plaintiff was not a publication.

The case of *Dickson v. Hathaway,* 122 La., 644, seems to sustain the ruling, although it does not clearly appear from the statement of facts that the letter in that case was read by the attorneys, and the case of *R. R. v. Brooks,* 30 A. S. R., 529, holds to the contrary.

Being of opinion, however, that the judgment is correct, it will not be disturbed, because based upon a reason to which we do not give our assent. *Hughes v. McNider,* 90 N. C., 248; *Hughes v. Hodges,* 94 N. C., 56.

Affirmed.