LEROY HEDGEPETH, BY HIS NEXT FRIEND, G. W. HEDGEPETH, v.
H. G. COLEMAN.

(Filed 12 April, 1922.)

**1. Libel—Slander—Actionable Per Se—Damages.**

Everything printed or written which reflects on the character of another and is published without lawful justification or excuse, is a libel, whatever the intention of the writer may have been, and many charges which if merely spoken of another would not be actionable without proof of special damages may be libelous *per se* when written or printed and published, although such charges may not impute the commission of a crime.

**2. Evidence—Typewritten Letters—Libel.**

Where the plaintiff, in his action for libel, has found in his mail box an anonymous typewritten letter, addressed to him, and the defendant has admitted that "he was knowing to it," the opinion of an expert in such matters that the anonymous letter, from certain characteristics of type, punctuation, spacing between lines, and from the general form of the letters, was the same writing, by comparison, as one the defendant admits to be genuine, and evidently written on his machine, is competent as tending to show the defendant's responsibility for the libelous typewritten letter.

**3. Libel — Communication— Third Persons—Actions—Damages—Causal Connection.**

While the defamatory words of a libelous letter must be communicated to another than the one to whom the defamatory words were written, to be actionable, it is sufficient if the defendant had communicated them to only one other person, or if, under the circumstances and the existing conditions, the defendant must have intended, or had reason to suppose, that the person addressed would do so, and the damage complained of was occasioned by the act, in the relation of effect and cause.

**4. Same—Minors—Duress.**

Where a libelous letter is addressed to a boy of between fourteen and fifteen years of age, it may operate so powerfully upon his immature mind as to amount to a coercion, and his communicating it to his near relation under such circumstances need not be conclusively considered as his voluntary act.

**5. Same—Parent and Child—Questions for Jury—Trials.**

In an action for libel, where the evidence tends to show that the defendant was responsible for a libelous letter to a boy between fourteen and fifteen years of age, charging him, without legal excuse, of larceny, and threatening prosecution and imprisonment if he did not return the stolen goods, and had good reason to believe that the boy would naturally show the letter to others through fear or for counsel and advice, it raised a question for the jury to determine whether the defendant must have foreseen the exposure of the letter as the natural and probable result of the libel.

**6. Evidence — Experts — Opinions — Instructions— Appeal and Error— Weight of Evidence.**

Where experts in typewriting have, upon competent evidence, testified to their opinion that a libelous letter, the subject of the suit, was written by the defendant, the refusal of the trial judge to charge the jury that they should "scan with care the evidence of the expert before arriving at a conclusion that defendant wrote the letter complained of," is not error, testimony of this character falling within the general rule that expert testimony is subject to the same tests that are ordinarily applied to the evidence of other witnesses. *Buxly v. Buxton*, 92 N..C., 479, cited and distinguished.

APPEAL by defendant from *Devin, J.,* at the November Term, 1921, of GRANVILLE.

The defendant was a merchant, depot and express agent, and postmaster at Lyon. In February, 1918, his storehouse and safe were broken into; and soon thereafter the plaintiff, a boy then between fourteen and fifteen years of age, found in his individual mail box the following paper-writing, sealed in an envelope addressed to him:

READ ALL THIS:                                         WASHINGTON, D. C.

We saw you next day after it happened. You showed guilt, but we wanted more evidence. We have plenty of it now, and would come right on and get you, but on account of your age, and for the sake of your relatives, we will give you one chance to make good by taking everything you got, tie it up and throw it into cat-hole of shed room door. If he finds it before next Sunday he will let us know, but unless it is found by Sunday we will come and get you, and there will be no more chance to stop it this side of Atlanta pen.

If it is found, no one will know that you put it there, and you may not be suspected by everybody, but if we come back, then it matters not who knows it, for we will push it clear through, and do it quickly.

Two men, who saw you one Wednesday.

The plaintiff showed this paper to W. T. Hedgepeth, his brother, and to T. M. Parrott, and his brother showed it to plaintiff's father. The

communication received by the plaintiff was typewritten. An expert witness compared it with a typewritten letter received from the defendant, and testified that in his opinion each paper was written on an Oliver typewriter, number four or five. He said: · "The type is the same, and the general appearance is the same; the body of each letter is written in single space; it is double-spaced between paragraphs; the marginal indentation starts immediately after the salutation in each letter; and the paragraphs down through the letter follow that beginning point; the spacing after the comma and before the next letter is the same; the letters E, A, C, D, and B, and the small letter s and the capital S and the period on each letter are out of alignment; the letter E is clogged at the top—not plain; also the letters T and W and the letter U are clogged and not plain; periods after the letter C and after the letter E in each letter; in each of these letters the letter C is struck out of place—the same impression and the same clearness; the margins on the right-hand side are similar; the periods and the dash are struck with such force as to leave an indentation on the back of each letter and the comma is distinct—that is, the period and the tail are distinct in each letter; the spacing after the comma is the same. These are some of the main characteristics in these two letters. That the style of the type is the same and the space between each written line, that is, from the bottom of the first line to the top of the second line, is the same. From these similarities pointed out he formed his opinion that they were written by the same person and on the same machine."

After reading the paper received by plaintiff, W. T. Hedgepeth showed it to the defendant, who denied writing it, but said that "he was knowing to it"; that efforts were being made to locate the person who had broken into the store; and that the matter was in the hands of a detective. Defendant told plaintiff's father that he would be wonderfully surprised when he found out who had broken into the store; that if the person who did so would bring back all he had and put it in the cat-hole of the shed room his name would not be exposed.

The defendant introduced no evidence. At the close of the evidence the defendant moved to dismiss as in case of nonsuit. Motion allowed as to the alleged slander and blackmail, and denied as to the alleged libel. Defendant excepted and appealed.

*John W. Hester and D. G. Brummitt for plaintiff.*
*Royster & Royster and A. W. Graham & Son for defendant.*

ADAMS, J. In *O'Brien v. Clement,* 15 M. & W., 435, *Parke, J.,* said: "Everything, printed or written, which reflects on the character of another, and is published without lawful justification or excuse, is a

libel, whatever the intention may have been." Many charges, which if merely spoken of another would not be actionable without proof of special damages, may be libelous *per se* when written or printed and published, although such charges may not impute the commission of a crime. *Simmons v. Morse,* 51 N. C., 6; *Brown v. Lumber Co.,* 167 N. C., 11; *Hall v. Hall,* 179 N. C., 571; *Paul v. Auction Co.,* 181 N. C., 1.

In the case before us, however, the anonymous communication appears to charge the plaintiff with an offense punishable by confinement in a Federal prison; and while the defendant does not deny that it is libelous *per se,* he controverts, chiefly on two grounds, the plaintiff's right to recover damages. These grounds are: (1) that the defendant did not write the paper referred to; and (2) that even if he did there has been no publication of it in contemplation of law.

As to the first, the defendant admitted that while he did not write the communication "he was knowing to it"; and there was expert evidence tending to show that this paper and a letter, the authenticity of which the defendant did not dispute, were written by the same person on an Oliver typewriter. This was not mere vague, uncertain, and irrelevant matter, but it was evidence of a character sufficiently substantial to warrant the jury in finding as a fact that the defendant was responsible for this typewritten paper of unavowed authorship.

As to the second ground of defense, the general rule unquestionably requires that the defamatory words be communicated to some one other than the person defamed. Folkard's Starkie on Slan. and Lib., 37; Newell's Def., Lib. and Slan., 227; *Shepard v. Lamplier,* 146 N. Y. S., 745; *Enright v. Bringgold,* 179 Pac., 844; *Howard v. Wilson,* 192 S. W., 474; *Traylor v. White,* 170 S. W., 412; *Walker v. White,* 178 S. W., 254. "The publication of a slander involves only one act by the defendant; he must speak the words so that some third person hears and understands them. But the publication of a libel is a more composite act. First, the defendant must compose and write the libel; next, he must hand what he has written, or cause it to be delivered, to some third person; then that third person must read and understand its contents; or, it may be that after composing and writing it, the defendant reads it aloud to some third person, who listens to the words and understands them: in this case the same act may be both the uttering of a slander and the publication of a libel." Odgers on Lib. and Slan., 157. But it is not necessary that the defamatory words be communicated to the public generally, or even to a considerable number. It is sufficient if they be communicated only to a single person other than the person defamed. *Jozsa v. Maroney,* 27 L. R. A. (N. S.), 1041; *Adams v. Lawson,* 94 Am. Dec., 455. For example, it has been held

that the publication was sufficient where the defendant had communicated the defamatory matter to the plaintiff's agent or attorney; or had read it to a friend before posting it to the plaintiff; or had procured it to be copied, or sealed in the form of a letter addressed to the plaintiff and left in the house of a neighbor, by whom it was read; or had caused it to be delivered to and read by a member of the plaintiff's family. The fact, therefore, that the paper under consideration may have been seen only by the plaintiff's brother and Parrott cannot exonerate the defendant on the ground that there was no communication to the public. *Tuson v. Evans,* 12 A. & E., 733; *Snyder v. Andrews,* 6 Barbour (N. Y.), 43; *Keene v. Ruff,* 1 Clarke (Iowa), 482; *Swindle v. State,* 21 Am. Dec., 515; Odgers, *supra,* 161; *Brown v. Lumber Co.,* 167 N. C., 9. But the defendant argued that even if this be granted, still there was no publication by him because the paper was communicated directly to the plaintiff, and the plaintiff alone divulged its contents.

We have stated the general rule to be that the communication of libelous matter to the person defamed does not of itself constitute a publication. The defendant's argument involves the question whether the rule is inflexible or whether it is subject to exception or qualification. The suggestion that as a principle it is immutable cannot be adopted. The ultimate concern is the relation that existed between the writing of the paper and the disclosure of its contents by the plaintiff. For running through the entire law of tort is the principle that a causal relation must exist between the damage complained of and the act which occasions the damage. Unless such relation exists, the damage is held to be remote, and cannot be recovered; but if such relation does exist, the wrongful act is held to be the cause of the damage. So in this case we cannot disregard the relation of cause and effect. "There is no publication such as to give rise to a civil action where libelous matter is sent to the person libeled, unless the sender intends or has reason to suppose that the matter will reach third persons (which in fact happens), or such result naturally flows from the sending." Street's Found. Leg. Liab., vol. 1, 296. Under this principle the mailing of a libelous letter to a person whose clerk, in pursuance of a custom known to the sender, opens and first reads the letter constitutes a publication. *Delacroix v. Thevenot,* 2 Starkie, 63; *Pullman v. Hill,* 1 Q. B., 524; *Runney v. Worthley,* 186 Mass., 144. Whether the principle extends to a disclosure by the person libeled is to be determined by the causal relation existing between the libel and the publication. The sending of libelous matter to a person known by the sender to be blind, or, having sight, to be unable to read, and therefore obliged to have it read by another, is, when read, a publication by the sender, because such exposure of the subject-matter is the proximate result of the writing and sending of the

communication. *Allen v. Wortham,* 89 Ky., 485; *Wilcox v. Moon,* 64 Vt., 450. These exceptions are based upon the principle that the act of disclosure arises from necessity. But necessity is not predicated exclusively of conditions which are physical. Necessity may be super-induced by a fear which is akin to duress. A threat may operate so powerfully upon the mind of an immature boy as to amount to coercion; and when an act is done through coercion it is not voluntary.

In the letter referred to there is a threat of prosecution and imprisonment. When it was received the plaintiff was between fourteen and fifteen years of age, and his youth was known to the defendant. With knowledge of the plaintiff's immaturity, of the character of the accusation and menace contained in the letter, of the probable emotion of fear, and the impelling desire for advice on the part of the plaintiff, the defendant must have foreseen the plaintiff's necessary exposure of the letter as the natural and probable result of the libel. Indeed, under the charge of his Honor, the jury found from the evidence that the defendant had reasonable ground to know that the letter would necessarily be seen by third persons. Obviously, then, the act of the defendant was the proximate cause of the publication. *Fonville v. McNease,* 31 Am. Dec., 556; *Miller v. Butler,* 52 Am. Dec., 768; *Pollard v. Batchelder,* 5 So., 695. This conclusion disallows all the exceptions relating to the motion for nonsuit, and to the defendant's prayer for peremptory instructions.

The defendant excepted to his Honor's refusal to give the jury this instruction: "That owing to the large number of typewriters of different kinds and makes now in use, and the similarity in styles of typewriting in the various schools, the jury should scan with care the evidence of the expert before arriving at a conclusion that defendant wrote the letter complained of."

The defendant relies on *Buxly v. Buxton,* 92 N. C., 479. There the issue was whether the bond sued on had been executed by the defendant's intestate. The plaintiff introduced evidence of the intestate's admission that he had signed the note, and each party introduced expert evidence relating to the alleged signature. The trial judge instructed the jury that evidence of the intestate's admission, if accepted as true, was entitled to greater weight than the expression of opinion by expert witnesses, and that an opinion as to handwriting should be received with caution. On appeal, it was held that an exception to this instruction was untenable; but it may be remarked that the learned justice who wrote the opinion was contrasting the relative value of positive with opinion evidence, and pertinently said that there "could be no harm in making the observation in regard to these classes of evidence and their relation to the controversy." But he did not say that refusal to give the instruction would have constituted reversible error. We should

hesitate to hold that there may not be cases in which it would be proper for the court to tell the jury that expert testimony should be received with caution; and we should be equally reluctant to pronounce such instruction an inflexible necessity. As the testimony of an expert ought neither to be blindly accepted nor arbitrarily rejected, so the question whether it is to be considered like other evidence or received with caution may depend upon the circumstances developed in the trial. But, generally speaking, expert testimony should be subject to the tests that are ordinarily applied to the evidence of other witnesses, and to the court's instruction that the jury must find the facts upon their own sound judgment. *R. R. v. Thurl,* 49 Am. Rep., 484; *Carter v. Baker,* 1 Sawyer, 512, 525; *Ezzers v. Eggers,* 57 In., 461; *Cuneo v. Bessoni,* 63 In., 524; *U. S. v. Pendergast,* 32 Fed., 198; *Madden v. Coal Co.,* 111 N. W., 57, 60; *Ryder v. State,* 100 Ga., 528; *Burney v. Torrey,* 100 Ala., 157. We find nothing in the record which removes the evidence referred to from the operation of the general principle, and for this reason exception seven is overruled.

The exceptions disposed of are those which were chiefly relied on in the argument. We have not overlooked the others, but have given them due consideration; and, having regard to the evidence and the charge, we have concluded that they cannot be sustained. Upon a careful review of the entire record we find no sufficient cause for disturbing the result of the trial.

No error.