Roger ARSENAULT, Plaintiff,

v.

ALLEGHENY AIRLINES, INC.,
Defendant.

Civ. A. No. 76–4275–MA.

United States District Court,
D. Massachusetts.

March 17, 1980.

Karl G. Spitzer, Peabody, Mass., for plaintiff.

James S. Dittmar, Goodwin, Procter & Hoar, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

The plaintiff brought this defamation action claiming that his former employer, Allegheny Airlines, Inc. (Allegheny), published an employment termination letter which contained false and defamatory remarks and resulted in injury to the plaintiff's reputation. Allegheny has moved for summary judgment, claiming that the publication was privileged and that the plaintiff has failed to prove actual malice so as to overcome Allegheny's conditional privilege. The plaintiff has filed an opposition to this motion with supporting memorandum. The record, including the pleadings, depositions and affidavits, presents the following factual setting.

The plaintiff, Roger Arsenault (Arsenault), was first employed by Allegheny in December, 1967. During the course of his employment, Arsenault was assigned to work at Boston's Logan International Airport and held positions in Allegheny's customer service department. He was first employed as a ramp agent, then as a lost and found agent and, just prior to his termination, again as a ramp agent. During a portion of Arsenault's employment with Allegheny, he was supervised by Frank H. Zuzel, customer service manager for Allegheny's Boston operation.

On January 17, 1976, Arsenault and a female companion flew to San Juan Puerto Rico aboard an Eastern Airlines aircraft using reduced fare passes issued by Allegheny. Having received a representation from Arsenault that he would be traveling with his wife, Allegheny issued these passes to Arsenault and his wife. While in Puerto Rico, Arsenault took advantage of hotel discounts available to airline employees traveling on employee passes.

The use of Allegheny's reduced fare passes and associated discounts is limited to employees of the airline and their immediate families. Upon Arsenault's return to Boston from Puerto Rico, Allegheny personnel discovered (and Arsenault subsequently admitted) that he had not traveled on these flights and shared these hotel rooms with his wife. The woman traveling with him was a security officer at Logan International Airport. Arsenault's actions, therefore, violated Allegheny policy regarding the use of this privilege.

During Arsenault's employment with Allegheny, the airline maintained a set of rules entitled "Personnel Policy Guide" (Policy Guide) which outlined the terms and conditions of employment, the grounds for discharge, grounds for disciplinary action, and outlined a multi-step employee grievance procedure. Arsenault's employment was governed by the Policy Guide. The portion of the Policy Guide relating to misuse of airline pass privileges stated that improper use of these privileges would be cause for suspension of the employee's privilege or immediate termination.

After completing the investigation of this matter, Zuzel met with Arsenault. During this meeting, Zuzel advised Arsenault that, unless he resigned, Allegheny would terminate him. On January 29, 1976, Arsenault resigned.

Following his resignation, Arsenault filed a grievance of his termination pursuant to Allegheny's multi-step grievance procedure. On March 5, 1976, G. Donald Hansbury, Allegheny's vice president for customer services, ordered Arsenault reinstated effective March 8, 1976. Arsenault's termination was, however, conditioned on his acceptance of a Step 4 probationary term for a period of eighteen months.[1] Arsenault accepted the terms of his reinstatement.

1. Allegheny's management manual provided that any infraction of a company rule by an employee on Step 4 during the designated probationary term would result in immediate termination of that worker.

Accordingly, he was reinstated and began work as a ramp agent.

During the summer of 1976 Allegheny's security department began an investigation into misappropriation of company money by airline ticket agents at Allegheny's Logan International Airport operation. During the course of this investigation, Zuzel was informed by Fred Santarpio, a ticket agent, that another ticket agent, Michael Marinelli, may have been involved in stealing funds from cash sales of one-way airline tickets at the Allegheny ticket counter. Later, on August 12, 1976, Robert Day, Allegheny's chief customer service agent, told Zuzel that Michael Curry, a service agent, informed him that Marinelli had asked him to participate in the theft of cash from one-way cash ticket sales and a theft of a camera from the lost and found department.

In a meeting between Robert Day, Joseph E. Rice, an Allegheny security officer, and Zuzel, Rice and Zuzel told Day that Marinelli was under investigation for the theft of funds from one-way cash ticket sales from the Allegheny ticket counter at Logan International Airport. At some point, Day was instructed that the matters discussed were confidential and should not be repeated to anyone other than the participants.

Allegheny security officers and representatives of the Massachusetts State Police planned a "decoy operation" to be executed on Sunday, August 15, 1976. As part of this plan certain plain-clothed Massachusetts State Police were instructed to purchase one-way airline tickets from Marinelli at the Allegheny counter by delivering cash to him. The plan was carried out but nothing resulted which would have implicated Marinelli in a theft.

Prior to the execution of the "decoy operation," Michael Curry told Zuzel that Marinelli had confronted him and told him that he knew that Curry told Allegheny officials of the alleged thefts at the ticket counter and of Marinelli's alleged participation.

Curry reported that Marinelli threatened him with bodily harm and possible legal action if he continued to make representations of this nature to the Allegheny authorities.

At the conclusion of the "decoy operation," Allegheny security officials received information which confirmed Curry's representation that Marinelli knew that he was the target of this probe. On August 17, 1976, Allegheny security personnel questioned Marinelli. During this interview, Marinelli told the officers that Arsenault told him that he was the subject of an investigation and that Curry was the source of information concerning his alleged participation. Marinelli also stated that Arsenault had identified Day as the source of Arsenault's information concerning the probe.

On August 18, 1976, Zuzel and other Allegheny officials interviewed Arsenault. Arsenault told them that his friend, Day, telephoned him and told him the details of the investigation into alleged thefts of money by Marinelli. Arsenault told him that Day called him because Day wanted Arsenault, who was still a probationary worker, to avoid trouble. Day told Arsenault to keep their discussion secret. Arsenault also told the investigators that shortly after he spoke to Day, he called Marinelli and told Marinelli that he was the subject of an investigation concerning misappropriation of money from the Allegheny ticket counter. Arsenault also told Marinelli all of the details concerning the probe which were known to him at that time, including the names of sources of information. At the conclusion of this interview, Arsenault signed a statement which summarized his answers to questions.

On August 19, 1976 Marinelli was arrested by state police and charged with a larceny offense concerning property belonging to Allegheny. The following day, he was discharged by Allegheny.[2]

Arsenault was, again, on August 23, 1976, interviewed by Zuzel. During this inter-

---

**2.** Marinelli was charged with stealing $49.00 from Allegheny Airlines in the East Boston District Court. After trial, a court found Mari- nelli to be not guilty of that offense. He was acquitted on October 5, 1976. Marinelli was thereafter reinstated to his job with Allegheny.

view, Day was present. The discussion revealed that Arsenault told Marinelli that Curry was the source of information about Marinelli's alleged thefts from the ticket counter. Once again, Arsenault signed a statement to that effect.

During the course of this investigation, Zuzel, on several occasions, conferred with his supervisors, Matt Sorts, regional director of ground services, and Raymond Garcia, director of ground services. Sorts and Garcia were based at Allegheny's customer services headquarters in Pittsburgh, Pennsylvania. Garcia, in turn, reported developments in the course of this investigation to his superior, G. Donald Hansbury.

Because of Arsenault's interference in the investigation, Zuzel decided to terminate his employment. In accordance with Allegheny's management manual, Zuzel discussed his decision to terminate Arsenault with Sorts and Garcia.[3] Sorts and Garcia agreed with Zuzel's position. Zuzel then talked with Garcia about the appropriate grounds for termination and they discussed the company policy guide. They concluded that the following portion of the guide, dated July 5, 1976, was the appropriate basis upon which to terminate Arsenault:

> Misappropriation, or attempted misappropriation of company funds, pilferage of company material, or theft of property or funds belonging to:
> —Allegheny,
> —another employee,
> passengers and shippers,
> as well as aiding and abetting another employee's violation of this provision, will result in the offending employee's termination.

On August 25, 1976, Garcia drafted a termination letter addressed to Arsenault. Garcia gave this draft to his secretary,

Agnes Pusateri. Agnes Pusateri then dictated the terms of Garcia's draft to Linda Gayron, Zuzel's secretary. Linda Gayron typed the termination letter. Zuzel reviewed the letter, signed it and directed that it be mailed to Arsenault. Arsenault received the letter, which provided:

"Dear Mr. Arsenault:

An investigation by our Security Department and our Customer Service Department pertaining to the aiding and imbeding [sick] of another employee in the misappropriation of company funds has now been completed.

In accordance with Allegheny's Personnel Policy Guide, section 4–40, page 4, you are hereby terminated from the company. As soon as articles issued to you by Allegheny are returned, your final paycheck will be released by all Departments of Allegheny and mailed to your home. Your final paycheck must include all loans with the Credit Union before it is released to you. Any vacation time still owed to you will be payed in this check. If you feel you have been given unfair treatment, you may pursue the matter through the Grievance Procedure. A copy of this Procedure is attached for your convenience."

In accordance with Allegheny policy, Zuzel attached a copy of the termination letter to Allegheny's "Termination and Leave Form, PE–22," sent a copy to Garcia, and sent copies to Allegheny's personnel, accounts receivable, payroll, budget, tax departments and credit union. Upon receipt of his copy, Garcia made additional copies and forwarded them to Sorts and Hansbury. Neither Garcia nor Hansbury transmitted the letter to any other person.[4]

Following his termination, Arsenault sought unemployment compensation bene-

---

**3.** Step V of the Allegheny management manual dated June 25, 1976 outlined a procedure which Allegheny management personnel must follow before discharging an employee. It stated in pertinent part: "The manager discusses the entire case with his/her Regional Director or the Director-Ground Services. Subject to the agreement of the manager, Regional Director, and Director-Ground Services, the employee is terminated."

**4.** The record makes it clear that other Allegheny workers knew the reasons for Arsenault's termination. None, however, except Arsenault, persons Arsenault showed the letter to, Garcia, Sorts, Hansbury, Zuzel, and their secretaries, actually read (or had read to them) the letter. The record is not clear on the means by which this information was communicated to other Allegheny workers.

fits from the Massachusetts Division of Employment Security (DES). The DES asked Allegheny to describe the circumstances which gave rise to Arsenault's discharge. Allegheny responded and told DES that Arsenault "aided another employee in the misappropriation of company funds." The DES denied Arsenault's claim for benefits.

■ In deciding whether summary judgment is appropriate in this case, we are guided by Fed.R.Civ.P. 56 and the principles outlined in *Hahn v. Sargent*, 523 F.2d 461 (1st Cir. 1975), *cert. denied* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 54 (1976). We must determine whether the defendant, as moving party, has demonstrated that there is "no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). Accordingly we view the record "in the light most favorable to . . . the party opposing the motion." *Hahn v. Sargent, supra* at 464 (quoting *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), and "indulge all inferences favorable to the party opposing the motion." *Hahn v. Sargent, supra* at 464, citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

■ This Court initially notes that summary procedures should be used sparingly where motive, intent or state of mind are at issue, *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Maiorana v. MacDonald,* 596 F.2d 1072, 1076–77 (1st Cir. 1979), and that "great circumspection is required" in such cases if the party opposing the motion provides the court with "some indication that he can produce the requisite quantum of evidence to enable him to reach the jury with his claim." *Hahn v. Sargent, supra* at 468.

■ In this diversity action, we look to the law of Massachusetts governing the tort of defamation. It is well-established that a publication is defamatory if it tends to injure one's reputation in the community and exposes that person to hatred, ridicule and contempt. *Brauer v. The Globe Newspaper Co.,* 351 Mass. 53, 55–56, 217 N.E.2d 736 (1966); *Mabardi v. Boston Herald-Traveler Corp.,* 347 Mass. 411, 413, 198 N.E.2d 304 (1964); *Anthony v. Barss,* 346 Mass. 401, 402, 193 N.E.2d 329 (1963); *Muchnick v. Post Publishing Co.,* 332 Mass. 304, 305–06, 125 N.E.2d 137 (1955). The test is "whether, in the circumstances, the writing discredits the plaintiff in the minds of any considerable and respectable class of the community." *Mabardi v. Boston Herald-Traveler Corp., supra* 347 Mass. at 413, 198 N.E.2d at 306 (quoting *Muchnick v. Post Publishing Co., supra* 332 Mass. at 305–06, 125 N.E.2d 137). A statement which expressly states or insinuates that the plaintiff is a criminal or participated in a criminal act is defamatory in proper circumstances. *Ezekiel v. Jones Motor Co., Inc.,* 374 Mass. 382, 372 N.E.2d 1281, 1287 (1978); *Mabardi v. Boston Herald-Traveler Corp., supra* 347 Mass. at 413, 198 N.E.2d 304; *see, Liquori v. The Republican Co.,* —— Mass. App. —— (1979 Mass.App.Adv.Sh. 2263), 396 N.E.2d 726.

■ In this case, Allegheny's statement regarding the plaintiff's participation in a scheme to misappropriate company funds is the type of assertion which would discredit Arsenault and expose him to hatred, ridicule and contempt in the minds of a considerable and respectable class of people. The quality of the statement is such that, if read, it would be understood by a person of ordinary intelligence, *Thayer v. Worcester Post Co.,* 284 Mass. 160, 162, 187 N.E. 292 (1933), who understands the English language, *see, Economopoulos v. A. G. Pollard Co.,* 218 Mass. 294, 297, 105 N.E. 896 (1914) (defamatory remark made in Greek not published to one who did not understand the Greek language), to mean that Arsenault participated in a criminal act and is, therefore, a criminal. Thus, in the absence of any privilege or defense which might be available to Allegheny, we conclude that the statements in the termination letter are capable of a defamatory meaning.[5]

---

5. Agency principles require that a corporation be held liable in damages when a libelous remark is made by one of its agents in the course of their employment. *Comerford v. West End Street Railway Co.,* 164 Mass. 13, 13–14, 41 N.E. 59 (1895).

The tort of libel requires that there be some publication of the defamatory remark. There can be no publication if libelous words are communicated to the plaintiff alone. *Economopoulos v. A. G. Pollard Co.*, supra at 297, 105 N.E. 896; *Hedgepeth v. Coleman*, 183 N.C. 309, 111 S.E. 517, 519 (1922); *Miller v. Butler*, 60 Mass. (6 Cush.) 71, 74 (1850). A libelous remark is published if (1) the defendant (or his agent) prepares, composes and writes the remark; (2) hands or causes the writing to be delivered to some third person; and (3) the third person reads and understands the contents (or the defendant reads the writing to some third person who listens and understands). *Hedgepeth v. Coleman*, supra 111 S.E. at 519; *see, Bander v. Metropolitan Life Ins. Co.*, 313 Mass. 337, 349, 47 N.E.2d 595 (1943).

In this matter, Garcia drafted the letter and gave a copy of the draft to his secretary, Agnes Pusateri. Agnes Pusateri then read and dictated the draft to Linda Gayron, Zuzel's secretary, over the telephone. Linda Gayron transcribed what Ms. Pusateri dictated. Linda Gayron gave the letter to Zuzel, who read the letter, signed it and returned it to Ms. Gayron. Ms. Gayron then photocopied the letter and sent copies to Arsenault, Garcia and various Allegheny departments. The letter was then, presumably, read by other Allegheny workers. Massachusetts has expressly rejected the proposition that there can be no publication of an intra-corporate communication, i. e., a writing between and among officers and agents of the same corporation in reference to the corporation's business. *Bander v. Metropolitan Life Ins. Co.*, supra at 348–49, 47 N.E.2d 595. We must conclude, therefore, that there was a publication of the letter when it was distributed among the Allegheny workers and otherwise communicated to persons other than Roger Arsenault.

The next consideration is whether the statements were privileged. We look first to the letter to the DES authorities. The plaintiff claims that Allegheny's transmittal of a copy of his termination letter, or similar publication, constituted a defamatory publication. Massachusetts General Laws Chapter 151A, section 46, provides in part:

All information transmitted to the director [of DES] or his duly authorized representative pursuant to this chapter shall be *absolutely privileged and shall not be made the subject matter or basis in any action of slander or libel in any court of the commonwealth.* (emphasis added)

The record establishes that Arsenault applied for unemployment benefits under M.G.L. c. 151A after Allegheny discharged him. Pursuant to an information questionnaire submitted to Allegheny concerning Arsenault's application, Allegheny submitted information concerning Arsenault's discharge to the DES officials. Allegheny's response was, in substance, a re-publication of the termination letter. This response may not, however, be the basis of an action for defamation under Massachusetts law. M.G.L. c. 151A § 46.

As to the other copies of the termination letter, the general rule in defamation actions involving an employer's remarks about an employee's work record is that such comments are conditionally privileged and are actionable only upon proof of actual malice. *Molinar v. Western Electric Company*, 525 F.2d 521, 532 (1st Cir. 1975), *cert. denied* 424 U.S. 978, 96 S.Ct. 1485, 47 L.Ed.2d 748 (1976) (applying Massachusetts law). Where the occasion is a privileged one, the defendant must prevail unless the plaintiff proves that the defendant published the remark maliciously, *Burns v. Barry*, 353 Mass. 115, 119, 228 N.E.2d 728 (1967); *Shore v. Retailers Commercial Agency, Inc.*, 342 Mass. 515, 520, 174 N.E.2d 376 (1961); *Galvin v. The New York, New Haven and Hartford*, 341 Mass. 293, 297, 168 N.E.2d 262 (1960); *Childs v. Erhard*, 226 Mass. 454, 456, 115 N.E. 924 (1917), or recklessly. *Ezekiel v. Jones Motor Co., Inc.*, supra 372 N.E.2d at 1287; *Hutchinson v. New England Telephone & Telegraph*, 350 Mass. 188, 191–92, 214 N.E.2d 57 (1966). The plaintiff bears the burden of proving that the defendant acted maliciously in order to extinguish the defendant's privilege. *Sheehan v.*

*Tobin,* 326 Mass. 185, 191–92, 93 N.E.2d 524 (1950); *Conner v. Standard Publishing Co.,* 183 Mass. 474, 480, 67 N.E. 596 (1903).

■ Where a defendant relies on a conditional privilege, the truth or falsehood of the allegedly defamatory remark is not material. *Sheehan v. Tobin, supra* 326 Mass. at 190, 93 N.E.2d 524. Put another way, in the absence of proof of malice, recklessness or ill will, the defense of privilege will prevail even if the remark was in fact false. *Doane v. Grew,* 220 Mass. 171, 176, 107 N.E. 620 (1915). The publisher's lack of belief or lack of reasonable grounds for belief in the truth of the defamatory matter may, in the proper circumstances, constitute malice and, accordingly, extinguish the privilege. *Sheehan v. Tobin, supra* 326 Mass. at 192, 93 N.E.2d 524, citing Restatement of Torts § 599, comment a.

■ In order to prove malice there must be some showing of "improper motive" or an "intent to abuse the occasion by resorting to it 'as a pretence,'" or some evidence of recklessness. *Ezekiel v. Jones Motor Co., Inc., supra* 372 N.E.2d at 1287. Unnecessary or unreasonable repetition of defamatory expressions may be considered malicious. *Bander v. Metropolitan Life Ins. Co., supra* 313 Mass. at 344, 47 N.E.2d 595. The manner in which the defamatory comment is communicated may, in some cases, be malicious. *Bander v. Metropolitan Life Ins. Co., supra* at 344, 47 N.E.2d 595. Finally, an absence of good faith by the publisher may be evidence of malice. *Shore v. Retailer Commercial Agency, Inc., supra* 342 Mass. at 521, 174 N.E.2d 376.

In this case, the record demonstrates that Allegheny made a fairly comprehensive investigation into the thefts from its ticket counter at Logan International Airport. During the course of this investigation a suspect was identified and later interviewed. In the course of this interview Marinelli, the suspect, told Allegheny officials that Arsenault told him the details of the investigation into thefts at the Allegheny counter. Moreover, Arsenault, during an interview with the same Allegheny officials, admitted this disclosure to Marinelli and his suggestion to Marinelli that Marinelli alter his course if he was involved in any activity that would violate Allegheny policy.

The Allegheny security officials viewed this disclosure by the plaintiff as an effort to thwart their inquiry. They therefore decided that Arsenault was "aiding and abetting" the misappropriation of funds.[6]

■ Our review of the record indicates that the plaintiff has not demonstrated that the defendant, through its agents, acted maliciously in publishing the termination letter. There was ample evidence before the Allegheny personnel upon which to base a conclusion that the plaintiff was acting to thwart their investigation or, alternatively, to assist another in escaping responsibility for his action. Indeed, the plaintiff, by his own admission, provided the Allegheny authorities with sufficient evidence for this conclusion.

The fact that Arsenault's alleged principal, Marinelli, was acquitted of a larceny charge by a competent tribunal (and, subsequently reinstated by the defendant) does not show malice or ill will when the defendant, in good faith, published the termination letter prior to the disposition of Marinelli's case before the East Boston District Court. When the letter was published, Allegheny had before it sufficient information upon which to conclude that Arsenault acted to aid or comfort another in the commission of a crime or in furtherance thereof. The fact that Arsenault probably committed no criminal offense at all is of little significance. What is of significance, however, is that Allegheny had reason to believe that Arsenault deliberately acted to further a criminal act *at the time the letter was prepared and published.*

---

**6.** Strictly speaking, the plaintiff's acts, as revealed in the record, probably would not be sufficient to constitute an aiding or abetting or, as described in Massachusetts, an accessory offense. M.G.L. c. 274 §§ 2, 4. *See, Commonwealth v. Perry,* 357 Mass. 149, 152, 256 N.E.2d 745 (1970) (mere knowledge that a crime is about to take place does not make one guilty as an accessory). We do not, of course, decide this issue. *Commonwealth v. Mangula,* 2 Mass.App. 785, 322 N.E.2d 177 (1975).

The record indicates that Allegheny made a thorough investigation prior to the publication. It establishes that the Allegheny officials relied only on the evidence before it when it decided to prepare and publish the termination letter. Finally there is a notable absence of any evidence which *tends* to show that the defendant, through its agents, acted maliciously, recklessly, made unnecessary publications of the letter, or did not believe in the truthfulness of their comment. The record makes it abundantly clear that the Allegheny authorities, in good faith, believed that Arsenault acted improperly in making the disclosures to Marinelli. There is no evidence that the defendant made the remark because they "didn't like" the plaintiff or made unnecessary or unreasonable publications of the termination letter. *See, Grindall v. First National Stores*, 330 Mass. 557, 559, 116 N.E.2d 687 (1953) (evidence that the store manager didn't like the plaintiff together with evidence that the store manager made the remark in a loud voice before store customers was sufficient evidence upon which a jury could find malice by the employer).

In light of the above, this case is appropriate for disposition by summary judgment. We recognize the policy that cases should be decided at a trial on the merits. But where the record is so complete, as it is in this case, with pre-trial affidavits, depositions and other documentary evidence from every critical witness, the Court has the complete factual setting which demonstrates that the defendant acted in good faith and that its comment, while perhaps not legally accurate, was fair. Viewing the record and the inferences which might be drawn therefrom in the light most favorable to the plaintiff, *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), the plaintiff has failed to show any evidence from which this Court could infer malice or ill will by the defendant's agents. The plaintiff knows now as much as he ever will about what was said and why it was said. All of the circumstances have been disclosed and all discovery has been available. *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). No purpose will be served by prolonging this litigation and submitting it to a trier of fact. The defendant is entitled to summary judgment.

SO ORDERED.