INTERNATIONAL BUSINESS
MACHINES CORPORATION,
Plaintiff, Appellant,

v.

CATAMORE ENTERPRISES, INC.,
Defendant, Appellee.

No. 76–1086.

United States Court of Appeals,
First Circuit.

Sept. 30, 1976.

Jack E. Brown, Phoenix, Ariz., with whom George E. Hilty, Paul V. Bonn, Lois W. Abraham, Neil S. Cumsky, Philip R. Higdon, Michael J. Malley, Phoenix, Ariz., Nicholas deB. Katzenbach, Armonk, N. Y., Palmer & Dodge, Boston, Mass., Edwards & Angell, Providence, R. I., Cravath, Swaine & Moore, New York City, and Brown & Bain, P. A., Phoenix, Ariz., were on brief, for plaintiff-appellant.

Thomas K. Christo and Albert P. Zabin, Boston, Mass., with whom Rosann C. Madan, Boston, Mass., was on brief, for defendant-appellee.

Before COFFIN, Chief Judge, McENTEE, Circuit Judge, and FREEDMAN,* District Judge.

COFFIN, Chief Judge.

This case is a paradigm of complex litigation, rivalling the complexity of the cyber-

* Of the District of Massachusetts, sitting by designation.

netics era from which it arises. It involves the unhappy relationships between a supplier of electronic data processing equipment and services, International Business Machines Corporation (IBM) and a customer, Catamore Enterprises, Inc. (Catamore),[1] a manufacturer and distributor of jewelry. The events at issue here spanned the years between 1967 and 1971 and concern the efforts of Catamore to computerize, and thus expand, its operations with leased IBM equipment and the assistance of IBM services—the scope and quality of which are the heart of this suit.

Suit began in October, 1972, with the filing of a simple complaint by IBM in which it sought to collect $68,453.23 from Catamore for rental of equipment and payment for services. Catamore filed an answer containing a simple denial of the facts that would give rise to liability and a counterclaim asserting that IBM had breached numerous express and implied warranties of performance and claiming damages of $250,000. A year and a half later, Catamore filed eight additional counterclaims, principally identifying different elements of alleged damage but adding specific allegations of breach of contract and false representations, and claiming damages of $15,-554,210. Trial began on March 10, 1975. On or about May 16, 1975 Catamore again amended its counterclaims in various particulars, adding a ninth counterclaim charging IBM with wanton, reckless, and negligent conduct and claiming $18,887,800 in actual damages and $7,293,234 in punitive damages. After 56 days of trial and 9 days of deliberation, the jury returned a verdict for IBM on its claim against Catamore in the amount of $68,453.23 and a verdict for Catamore on its counterclaims in the amount of $11,400,000.[2] IBM now appeals from the $11,400,000 judgment entered against it.

Catamore has not appealed from the judgment against it.

IBM argues on appeal that, as a matter of law, there is no basis for liability for breach of contract or for negligence. In addition, it challenges the evidence and instructions as to damages and maintains that a number of rulings at trial and the allowance of excessive latitude to Catamore's counsel contributed to confusion and error.

In reviewing this case, we are not insensitive to the fact that we are dealing with a most arduously protracted trial, in which the district court took the utmost pains to avoid captious rulings, be fair to both parties, and to give both sides advance notice of its problems and proposed instructions. Equally weighty in our minds is the deference to be given the jury, which, faced with a host of complex issues on both liability and damages, spent nine days deliberating over the evidence of this 56 day trial. We are nevertheless compelled to vacate the judgment below and remand for a new trial. For reasons which are stated below, we deal only with the questions of contract liability.

What we might term the contract history of this case is the following. In the mid-1960's Catamore was a thirty-year old family company, which had specialized in selling religious jewelry to wholesalers and was in the process of expanding and diversifying its business. It was not only selling a general line of jewelry but, by 1965, was experimenting with a new sales method, "program selling", in which wholesalers were bypassed and, after market tests were run, prepackaged units of jewelry items were placed directly in retail stores of some of the large chains. Reordering would take place several times a year.

Catamore's tests led to increasing sales and expectations and the recognition that

---

1. Catamore, during the period giving rise to this litigation, was a group of closely related corporations organized by the Catanzaro family. The surviving corporate entity, after mergers, is the Phylcris Corporation.

2. The court had earlier denied IBM's motion which sought a directed verdict as to all counterclaims except as to the ninth (charging negligence). Subsequently, after judgment, and after further hearing, the court denied IBM's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.

for it to develop capacity to process dramatically increased quantities of retail orders, and to coordinate production with demand, it would require a system of production control using electronic data processing equipment. Conversations between Catamore's President, Robert Catanzaro, and an IBM salesman, Davitt, led to a study of Catamore's needs by an IBM systems engineer. Thereafter, IBM's representative staged a presentation for Catamore, in which he explained—through the use of schematic charts—the different steps necessary to computerize Catamore's production control system.[3] At this point, in September, 1968, Catamore decided to adopt such a system. It proceeded to sign a Machine Service Agreement, providing for the lease of a computer. Both parties understood that it was to be installed in December of 1969, after the necessary preparatory work had been done.

The core of this dispute is the opposite understandings of the parties as to who had the responsibility for doing this preparatory work, which consisted of general systems design (as to overall flow of the system), a more refined detail systems design,[4] and programming.[5]

It is Catamore's contention that IBM orally agreed to furnish, along with the computer, a completely computerized production control system on a "turnkey" basis, so that Catamore personnel (who would have had training in operating the system) could take over all operations. Even the ordinarily time-consuming task of programming was allegedly assumed by IBM since it would use and merely modify preexisting programs already in its library of programs. Catamore had only the obligations of hiring a programmer/maintenance man to run and keep updated the system after installation and of converting basic data used in its manual system so that the data could be used by the computer.

It is IBM's view that, on ordering the computer equipment, Catamore would have available to it, at no extra cost, both the education of Catamore's employees in data processing and assistance in systems engineering design. The latter, according to one IBM witness, Davitt, meant that, to take one of the four operations of production control, the order entry system, IBM, working with Catamore, would develop a "systems design flow chart of order entry", i. e., more detailed design of this function, on the basis of which a programmer could begin to work.[6] The programmer then would write even more explicit instructions and then translate those into a coding language understood by the computer. Catamore would be allowed to use IBM facilities

---

3. This system included four functions of Catamore's operations: (1) an "order entry system" for the analysis of incoming orders from customers (i. e., showing what end product items were required); (2) invoicing (i. e., showing what end product items have been shipped); (3) inventory control (i. e., showing what items are on hand); and (4) a bill of materials system (i. e., showing what components are required to fill incoming orders).

4. The second stage of systems design, analogized by a Catamore witness to the reduction of an architect's concept of a house to the specifications given a draftsman for the purpose of preparing blueprints. Its parameters, however, do not seem to be the subject of widespread agreement.

5. Pursuing the architect analogy, the instructions to men and machines who build the house; there, the writing, in machine language, of a multitude of explicit instructions to a machine to enable it, for example, to produce, from appropriately organized data, a payroll.

The process was described by Catamore's witness as starting with logical analysis, continuing with the writing of instructions, followed by a host of more explicit instructions ("coding"), and concluding with tests to identify and eliminate the inevitable human error encountered in writing instructions. The witness stated that a payroll program would probably require 20,000 explicit instructions, which might take a programmer a year, in the course of which he might initially write an erroneous instruction in every 200 or 250 instructions.

6. Documents developed at this stage would include report layouts, showing both what reports produced by the computer would look like and the location of each piece of information on the report document; specifications of the reports expected from the computer and the information needed to produce the reports; and charts showing the flow of work.

for testing. But all programming would be Catamore's responsibility, IBM not at that time performing this service for customers. IBM did, however, offer Catamore any of the package programs in its library which might be useful.

These contrasting views as to who was to do what were the seeds of what followed. While a chart of steps to be taken, and times within which they should be taken, to prepare for the December, 1969, installation of the computer and start-up of the new system had been a part of IBM's sales presentation, little seemed to be happening by way of joint consultation or implementation by either party during the next nine months. Some work on systems design was done by IBM; in April of 1969 Catamore had hired a controller, Correra, to supervise its data processing project; a start had been made on converting the items of Catamore's inventory to computer compatible numbers and a larger computer had been placed on order. But no Catamore employee had obtained any data processing education. In the meantime, Catamore had pushed ahead with its new sales approach, bringing back a significantly increased number of orders as the result of testing its product lines and packages in many retail outlets. It also prepared for expansion by making arrangements for additional facilities, financing, and new products.

In June, 1969, IBM announced a new policy to all its customers, stating that systems engineering services would be supplied on a charge basis, except that assistance which had earlier been mutually planned would be continued to be supplied without charge until January 1, 1970. In addition, rental charges would be reduced 3 per cent. This came to be called "unbundling". Ca-

tanzaro testified that he was assured by IBM's Davitt that unbundling would not affect Catamore since IBM's commitments would be fulfilled before January 1, 1970. When a new IBM marketing representative, O'Reilly, took over the Catamore account in September, 1969, from Davitt, he saw that the time remaining until December was inadequate to perform all the tasks necessary to launch the new system, and recommended to Catamore that delivery of the equipment be deferred to March or April of 1970. This was agreeable to Catamore, which was seeking a new building and which would not face another business season until the fall of 1970. It set an outside installation date of September, 1970.[7]

In November of 1969 IBM wrote Catamore, referring to the provision in the unbundling announcement that services earlier "mutually planned" would be continued without charge until January 1, 1970. It listed the areas so agreed upon as: "Production Control, Inventory, Order Entry, Invoicing, Accounts Receivable, and Accounts Payable."[8] It then noted that "the system design for production control has been 90% completed with the remaining accounting application systems [presumably Accounts Receivable and Accounts Payable] to be designed." It concluded by stating that after January 1, 1970, services in the noted areas would be on a charge basis "as stated in our Agreement for IBM Systems Engineering Services." The parties disagree as to the message conveyed by this letter, Catanzaro testifying that he had been told by IBM personnel that the 90 per cent included programming, IBM witnesses insisting that this referred only to systems design.

---

7. Catanzaro testified that "Software [i. e., the work on the production control system] was to be completed by January 1, 1970 and be delivered with the hardware." Apparently, in his view, the software was to be finished on the original schedule, but kept by IBM for a period up to eight months. Catanzaro explained this by saying that "the software had to be completed because after January 1st, 1970, IBM would be charging us for these services." As we have noted, it was O'Reilly's view that the programs would not be ready at this time.

8. This listing does not conform to the parties' general treatment of "production control" as a system embracing the more particular elements of order entry, inventory, invoicing, and bills of material. The author of the letter later told Catanzaro that this listing was inaccurate in so listing "production control" and in omitting bills of materials.

Shortly thereafter, on December 9, 1969, Catamore signed IBM's form "Agreement for IBM Systems Engineering Services" (SES). This agreement stated that it was to govern all assistance in the installation and use of data processing products; that it was "the complete and exclusive statement of the agreement between the parties, which supersedes all proposals oral or written and all other communications between the parties"; that the customer's exclusive remedy should be limited in nature and amount to the amount paid for services under the applicable Service Estimate, that IBM would not be liable for lost profits or other claims, or for consequential damages; and that no action "arising out of the services under this Agreement may be brought by either party more than one year after the cause of action has accrued." [9]

On the same date Catamore signed a Service Estimate, or authorization, in the amount of $4,884 for work to be done by October 31, 1970—in contrast to the September, 1970, date which was orally agreed upon—on the production control system and other items. The forms stated that authorization was given "under the terms of the captioned Agreement for IBM Systems En-

gineering Services". Catanzaro testified that in authorizing his subordinate to sign this agreement, he did so because "we had committed our company to a course of action that was irrevocable" and, having been told that the remaining 10 per cent of work to be done would cost about $5,000, felt that all he would be giving up was the difference between this added obligation and the 3 per cent reduction in rental Catamore would receive.

On January 29, 1970, Catamore executed a second authorization in the amount of $2,508 for work to be done by March 30, 1970 in performing "the detail design and definition of the order entry/Inventory Control System previously developed  .  . Included in this estimate are: 1. Program Descriptions. 2. Transaction Analysis. 3. Major Report Layouts. 4. Record and File Specifications [.] At the termination of this scope of effort, an estimate will be submitted covering programming implementation and documentation of the systems." This authorization contained the same explicit reference to the SES as did the previous authorization.[10]

At this point the focus shifts. In early 1970 Catamore not only had seen its pro-

---

9. Because it is so critical to this case, we quote the SES agreement's limitation of liability clause in its entirety.

Limitation of Liability

The Customer agrees that IBM's liability hereunder for damages, regardless of the form of action, shall not exceed the total amount paid for services under the applicable Service Estimate or in the authorization for the particular service if no Service Estimate is made. This shall be the Customer's exclusive remedy.

The Customer further agrees that IBM will not be liable for any lost profits, nor for any claim or demand against the Customer by any other party.

No action, regardless of form, arising out of the services under this Agreement, may be brought by either party more than one year after the cause of action has accrued, except that an action for nonpayment may be brought within one year of the date of last payment.

IBM does not make any express or implied warranties, including, but not limited to, the implied warranties of merchantability and fitness for a particular purpose.

In no event will IBM be liable for consequential damages even if IBM has been advised of

the possibility of such damages. [Emphases omitted.]

10. Catanzaro testified that he understood this authorization to cover one half of the work previously authorized for $4,884, and that completion of this segment would see the job 95% finished. It seems unlikely that this additional authorization, which made no reference to a "parent" authorization, and which had a two-month period for completion—in contrast to the prior authorization's ten-month period—would reasonably be so construed. Moreover, the notation that an estimate covering "programming implementation" would be submitted when the work referred to was completed would, we think, have alerted Catamore that the work, as Catamore envisaged it, was far short of being 95% complete. A more likely explanation was given by two IBM witnesses, who testified that (according to Correra, who was not called to testify), this authorization was given by Catamore because it had not yet obtained a data processing manager who would have undertaken the more detailed work described. While Catamore asserts in its brief that this is not true, no effort to rebut this testimony was made.

gram selling continue to expand but seized an opportunity to enter the costume jewelry field. When one of its customers (a costume jewelry firm which had bought fine jewelry from Catamore to supplement its line) ceased to do business with it, Catamore hired the customer's experienced sales force and Catanzaro brought about the creation of two new corporations, M. V. Creations, Inc., which was to purchase costume jewelry, and Vicario, Inc., which was to be a selling company (hereinafter referred to as MV/Vicario). A new and urgent need for a data processing merchandise control system arose. According to Catamore an oral agreement was reached in mid-March, 1970, for the creation of a merchandise control system to be completed in eight weeks. A larger computer was ordered and, beginning on March 30, 1970, a series of SES Estimates was entered into by MV/Vicario. All of these contained the above mentioned reference that "authorization for the above work is given under the terms of the captioned Agreement for IBM Systems Engineering Services".

The subsequent unfolding of events may be even more telescoped, since they are not germane to the issues we deem presently controlling. The system supplied to MV/Vicario, according to Catamore witnesses, failed to reflect inventory accurately, with the result that it ended 1970 in a badly overinventoried position. When September, 1970, arrived, Catamore was still without a production control system and, faced with a deluge of orders, resorted to extreme efforts to cope with a crisis but was unable to process many orders. "Locked" into IBM equipment and system, Catamore, according to Catanzaro, was forced to await a 1971 delivery. The MV/Vicario salesmen, faced with reduced advance "draws" against commissions, left. Catamore again faced the busy fall season of 1971, unable to cope with orders and losing customers. An IBM study of Catamore's problem, presented in December, 1971, revealed, according to Catanzaro, only the problems he knew existed three years earlier. Various threats, cancellations, restrictions, promises, demands, and negotiations occupied the latter part of 1971 and much of 1972.[11]

While this narration is extensive, we have omitted reference to voluminous testimony bearing on acts IBM may or may not have done which would be relevant to Catamore's allegations of fraud, misrepresentation, or negligence. In so compressing our presentation of the facts, we have not captured the full flavor of Catamore's case, in its assertions and evidence as to negligence,[12] fraud and misrepresentation,[13] or damages.

11. We omit from this narrative the events as seen by IBM—principally detailing the multifaceted business efforts of Catanzaro, it being part of IBM's theory that much of the cause of Catamore's difficulties arose from the key man, Catanzaro, overextending himself. We do not deem this subject matter relevant to our present discussion.

12. Catamore relies on such items as the assignment by IBM of a mere trainee to design Catamore's system, the choice of a particular computer before the general design had been finished, the incompatibility of the computer with the type of disk storage drive chosen, the ordering of only two disk storage devices when three were called for by the flow charts prepared, the incompatibility of the computer with the particular "Bill of Material Application" package program planned to be used, IBM's advice that Catamore not have outside consultants, IBM's advice to convert to a new inventory numbering system without keeping a parallel system in reserve, a failure by IBM to warn adequately of the latent dangers of adopting a system based on electronic data processing.

13. Catamore's catalogue of alleged frauds includes a "bait and switch" allegation (in that IBM, without Catamore's knowledge, cancelled the original computer order and substituted an order for a larger machine); IBM advice to change the inventory numbering system to an 8 digit system and thereby lock Catamore into computerization; the alleged representation in November, 1969, that IBM's work on the production control system was 90% completed; IBM's representation that the remaining 10% of the system would be completed for no more than $5,000; a misrepresentation as to an April, 1970, delivery date when IBM knew the equipment was not to be shipped till August; a misrepresentation that unbundling would not effect a price increase.

At this point we summarize in more detail both the theories of liability which were submitted to the jury and the parties' present positions with respect to them. Catamore's contract claims arise from its allegation that it and IBM entered into two separate oral contracts, each of which could be enforced consistent with the Statute of Frauds: the 1968 oral agreement for a production control system and the 1970 agreement for a data processing merchandise control system for MV/Vicario. A pivotal issue, of course, is the applicability of the SES agreement's limitations of liability clauses to these causes of action. The district court refused to rule that these contract claims were subject to the limitation of liability clauses in the SES agreement as a matter of law. It thought there was sufficient evidence of misrepresentation for a jury to find that Catamore had been induced to enter the SES agreement by fraud, rendering the agreement itself voidable, and that there were no other impediments to its rescission. *See* note 13, *supra.* Whether or not the SES agreement was valid, the district court also believed there were bases for regarding the two oral agreements as wholly independent of the SES agreement and not subject to its limitations. It therefore also permitted the jury to find both that the SES agreement was in effect and that both breaches of contract claims were meritorious. Catamore, in addition, now maintains that, whether or not the SES agreement is voidable, the limitations of liability clauses in it are themselves void and may not bar its contract claims.

IBM, not surprisingly, insists that the jury should not have been permitted to consider the contract theories of recovery. In its view, neither oral contract was enforceable: the 1968 agreement was within the Statute of Frauds and the 1970 agreement was not a contract since the parties intended that it would be reduced to writing before it would become binding. In any event, IBM insists that, as a matter of law, both contract claims were subject to the SES agreement—which it maintains was valid in all respects—and were barred by it.

Catamore's negligence claim is that IBM, in its dealings with Catamore, committed numerous unreasonable acts of misfeasance, all of which were independently actionable in negligence regardless of their relation to the contract claims. Even if the SES agreement barred the contract claims, Catamore maintains that the limitations of that written agreement should not be construed to apply to its negligence count. IBM, on the other hand, contends that the negligence claim should never have gone to the jury. Its view is (1) that the district court abused its discretion in permitting the addition of a negligence counterclaim on the twenty-ninth day of trial; (2) that, under the facts of this case, Catamore's sole remedy was in contract; and (3) that even if a negligence action was maintainable, this action too was subject to the limitation of liability clauses in the SES agreement.

Although the parties have briefed the whole range of issues referred to above, we will not, at this juncture, rule on the propriety of the trial court's having submitted each of these theories of liability to the jury. As to one issue, the objections IBM raises are not before this court.[14] Al-

---

14. IBM failed to take the steps required to preserve its substantive objections to Catamore's negligence claim. It neither moved for a directed verdict on the negligence counterclaim nor objected generally to the trial judge's instructions on this theory. However, it did belatedly raise its objections when it moved for a new trial following the jury verdict. Insofar as IBM's present objections amount to claims that the instructions to the jury were erroneous, it is precluded from obtaining appellate review because it did not present its objections to the trial court. The motion for a new trial alone is insufficient to place these issues before this court. *See Morris v. Travisono*, 528 F.2d

856, 859 (1st Cir. 1976); *Nimrod v. Sylvester*, 369 F.2d 870, 873 (1st Cir. 1966), and cases cited. Insofar as IBM's claim may be characterized as an attack on the sufficiency of the evidence of negligence, its failure to move for a directed verdict bars it from obtaining normal appellate review. *See LaForest v. Autoridad De Las Fuentes Fluviales*, 536 F.2d 443, 445 (1st Cir. 1976). Although there may be a limited exception to this rule in cases in which appellant moved for a new trial below on this ground and in which the jury verdict is totally without legal support, *see, e. g., Oliveras v. American Export Isbrandtsen Lines, Inc.*, 431 F.2d 814, 817 (2d Cir. 1970), we do not consider

though we recognize that a decision by this court as to all the others would simplify a second trial of this case, we do not undertake the task. Some of the issues are novel, and a few involve what appear to be close legal questions. We are reluctant to extend this opinion to include a number of complex legal determinations where it seems likely that some may ultimately not be necessary to the resolution of this dispute. Some of these questions will be determinative only if the jury makes factual assumptions which, while perhaps not improper, are unlikely. Because special verdicts were not returned in the first trial, *see* Fed.R.Civ.P. 49, we have no way of knowing either the factual assumptions the jury made or the theories of liability it found persuasive. While we would encourage at least the limited use of interrogatories in any retrial that occurs, *see* Fed.R.Civ.P. 49(b), we are confident that, whether or not they are used, the factual predicates of any jury verdict at a second trial will be clearer since the issues will have been narrowed as a result of our opinion today. In the appeal of that judgment, this court would be in a position to rule, on the basis of more focused briefs and factual presentations, on whatever legal issues appear to have in fact been determinative.

For the present, therefore, we focus in particular upon the issue whether, under New York law,[15] the SES agreement, the voidable character of which we leave to the second trial,[16] barred the counterclaims for the breach of the two oral contracts. We do so because these contract issues predominated at the first trial and probably were conceived by the jury as central to the resolution of this dispute. Moreover, unlike many of the other claims where we cannot now say with any certainty that egregious errors were committed, we think that—notwithstanding the care taken at trial and indeed perhaps because of the spirited, relentless thrust and parry of this extended trial—the significance to be accorded facially comprehensive written agreements between sophisticated corporate entities was undervalued.

■■■ The morass of business dealings between two companies described on this record, their promises oral and written, the disparity of their understandings, the frustration of expectations, the inevitable recriminations and conflicting memories—all this is not unique, new, or infrequently encountered. The law in its effort to facilitate just resolutions of such controversies has, over the centuries, developed certain aids or guides to decision. Two of these are involved in the critical contracts questions at issue here. The first is the substantive principle that when, in the course of business transactions between people or corporations, free and uncoerced understandings purporting to be comprehensive are solemnized by documents which both parties sign and concede to be their agreement, such documents are not easily bypassed or given restrictive interpretations. The second is the functional principle that in our system of resolving disputes, the judge and the jury share in the decision process. In such a case as this the judge must first assess the evidence in order to decide whether, under the substantive principle as illuminated by

its applicability here. It is doubtful that such a "plain error" has been committed, *compare Nimrod v. Sylvester, supra* at 873, and since a new trial will occur in any case and with further opportunity for IBM to present timely objections, there is no reason to depart from normal and well understood practice.

IBM's "procedural objection" to the negligence counterclaim is, of course, before this court. However, we are satisfied that the allowance of the amendment to the counterclaim was not an abuse of discretion by the trial court. The amendment simply brought the pleadings into conformity with the proof.

15. The SES agreement specified that it was to be governed by the law of New York. Both parties appear to have assumed that any issues concerning the validity or application of this agreement are to be determined under New York law, and we do not make choice of law an issue on appeal.

16. At any second trial that occurs, we specifically encourage the trial court to use Fed.R. Civ.P. 49(b)'s mechanism to determine whether the jury found the SES agreement voidable, either in whole or in part, by reason of fraud on the part of IBM.

precedents, the jury should do the weighing.

■ Here, we think the judge improperly permitted the jury to conclude that the SES agreement, if not voided by fraud, had no effect on Catamore's claims of breach of the 1968 and 1970 contracts. The SES agreement contained a clause providing that an action for breach of contract could not be brought more than one year after the cause of action arose. Neither of Catamore's breach of contract counterclaims were made within one year after the respective causes of action accrued.[17] These actions are therefore time barred if the SES agreement applies to actions brought under the two oral agreements and if the limitation clause is valid. We are persuaded that the clause applies and is valid.

As to the 1968 oral agreement, the jury found in September, 1968, that IBM did in fact orally undertake to deliver a completely designed and programmed, turnkey production control system.[18] Given this finding, this contract concededly had complete

vitality until December 9, 1969, when the SES agreement was signed. If all that had occurred on December 9 was the execution of the SES agreement, it may well have been open to the jury to decide that it had *no effect on the September, 1968, oral agreement.* By its terms, SES purported to supersede "all proposals oral and written and all other communications between the parties relating to the subject matter of this Agreement." Since an executed contract, oral or written, is not a proposal, and of higher dignity than a "communication," SES would seem not necessarily to apply. At the very least there would seem to be enough facial ambiguity to justify accepting other evidence of the parties' intent.

■ But the execution of the SES was accompanied simultaneously by Catamore's execution of its first Service Estimate. The Estimate was, according to Catamore, for the remaining 10 per cent of the work to be done. And, as we have noted, the Estimate form contained the statement, *immediately above the space for a customer's signature,*

17. Catamore's cause of action for IBM's failure to deliver a turnkey production control system accrued—if not by the deferred installation date in September, 1970—at least, by June, 1971, when Catamore's staff was ordered to undertake the programming of the order entry and billing system. Catamore's counterclaim was filed on January 3, 1973, which, of course, was more than a year after the cause of action arose.

MV/Vicario's cause of action for breach of the 1970 oral agreement for a merchandise control system arose on one of the following dates: December, 1970, when it first discovered that programming deficiencies were allegedly resulting in excessive inventories; June 1971, when MV/Vicario began going out of business; or December, 1971, when Catanzaro had demanded a rebate of $25,000 because of the alleged aforementioned programming defects. We need not decide the date on which the cause of action arose since in any case it was more than a year before the filing of Catamore's first counterclaim.

18. Although IBM does not appear to be now challenging the sufficiency of the evidence of the oral 1968 agreement, we note both that the Machine Services Agreement's terms were such that the evidence of the 1968 parol agreement was properly admitted and that there was sufficient evidence of the alleged agreement to submit the question of its existence to the jury.

We also note that we do not believe that the enforcement of this agreement was precluded by the Statute of Frauds. Although the alleged September, 1968, agreement called for delivery of the production control system by December, 1969, it nonetheless was not a contract which "by its terms is not to be performed within one year" within the meaning of the Statute of Frauds. This provision of the statute is interpreted narrowly. *See* 2 Corbin on Contracts § 444; *Duncan v. Clarke*, 308 N.Y. 282, 125 N.E.2d 569 (1955). Although the parties to a contract may contemplate that it will not be fully performed within a year, such a contract will not be within the Statute unless performance within a year would itself be clearly contrary to the intentions of the parties. *Id.; compare* Williston on Contracts. § 500 at 600. Here, the oral agreement could have been performed within a year consistent with the parties' intentions. Although there is testimony to the effect that the parties contemplated completion of the production control system by December, 1969, the testimony does not suggest that the parties actually intended that delivery should occur only on that date. Rather, it seems that December, 1969, was simply the time by which performance must occur and that performance prior to that time would not have been inconsistent with the parties' understanding.

that "Authorization for the above work is given under the terms of the captioned agreement for IBM Systems Engineering Services." Catamore's president, as we have also noted, testified that what he thought to be the remaining 10 per cent of the work on the production control system was to be performed under the SES agreement. Because Catamore's claim for damages for breach of contract arises from IBM's failure to *complete and deliver* the production control system and since Catamore appears clearly to have entered into an arrangement whereby the last 10 per cent of the work on this system was to be performed subject to the SES agreement, its claim for breach of this promise is necessarily governed by the one-year limitation period contained therein.

Because the parties have cast this issue in such different terms, we emphasize what we have not decided. We are not deciding that the SES agreement replaced or superceded the 1968 oral contract in its entirety. *See* 3 Corbin on Contracts § 578. Nor have we been required to determine which of two inconsistent provisions—one in the oral contract and one in the written contract— apply. *Compare Laskey v. Rubel Corp.*, 303 N.Y. 69, 100 N.E.2d 140 (1951). The SES provisions are new clauses, not inconsistent with any earlier ones. Catamore's argument that the SES agreement did not replace the *entire* earlier agreement misses the point. We accept the proposition that "parol evidence, which does not vary or contradict the writing, is admissible to complete the understanding of the parties." Here, however, we are concerned with the reverse situation: a writing which does not vary or contradict the evidence of the terms of the parol agreement.

■ Catamore objects to the application of the SES agreement to the 1968 contract

on the grounds that when it entered the SES agreement it was ignorant of wrongs IBM had already committed in performing the 1968 contract. It insists that it cannot be held to have waived any rights under a contract when ignorant of wrongs already committed. This argument misses the mark. Although the evidence of wrongs IBM had already committed may well be relevant as to whether the SES agreement was fraudulently induced—at least insofar as it applied to causes of action arising under the 1968 oral contract—and this evidence may also be supportive of other theories of recovery, it is irrelevant to the question of the effect of the SES agreement, if valid, on the contract action arising from IBM's failure to deliver the turnkey production control system by September, 1970. In December, 1969, Catamore agreed that any such action must be instituted within a year after its accrual. The present action not having been so instituted, it is barred by the SES agreement.

The applicability of the SES agreement to the performance of the 1970 oral agreement involving IBM and MV/Vicario is even more clear. Here again, the jury appears to have found that the discussions in the spring of 1970 culminated in a mid-March oral agreement providing that IBM would deliver a merchandise control system to MV/Vicario in eight weeks. Beginning on March 30, 1970 a series of Service Estimates were executed for work to be done for MV/Vicario.[19] Each such authorization contained the same notation that the authorization "is given under the terms of the . . . [SES]." Catanzaro had testified that IBM's work for MV/Vicario was on the basis of the SES agreement.[20]

■ Catamore argues that MV/Vicario is a separate corporation and, since it was not a party to the SES agreement, the refer-

---

**19.** The first was signed by the customer, using the name "Catamore Jewelry Co. M V Creations Division"; subsequently only the name "M V Creations" appeared. At least one of these, dated May 28, 1970, was signed by Catanzaro for M V Creations.

**20.** We express no opinion on IBM's contention that no parol contract could have been formed because the parties had contemplated committing their agreement to writing before it would become binding. This question will be relevant on remand only if the SES agreement is found voidable not only as it is applied to the 1968 oral agreement but also to this agreement.

ences to SES in the Service Estimates were not sufficient to require a conclusion that the SES limitation of liability clause applied to MV/Vicario. But the entire record in this case demonstrates the intimate relationship between Catamore and MV/Vicario as interrelated parts of a common enterprise in which Catanzaro was the dominant leader. *See also* note 17, *supra.*[21] Catamore suggests that if the SES has any application to the MV/Vicario Estimates at all, it is limited to "the purpose of authorizing work to be performed". Catamore argues that this must be strictly construed against IBM and be read to refer only to a clause which states that estimates may be agreed to in writing, are not guaranteed and do not constitute a fixed price contract. But all of this information is set forth in the Service Estimate itself; absolutely no justification exists for construing this incorporation by reference so narrowly. The SES is a two-page document containing provisions under ten captions.[22] We see no such ambiguity in the words "Authorization for the above work is given under the terms of [SES]" as would justify any construction that would incorporate some terms and exclude others. 3 Corbin on Contracts § 559, p. 276. *See Level Export Corp. v. Wolz, Aiken & Co., supra.*

Since we find that the limitations in the SES agreement apply to both of Catamore's contract actions, we must now consider the validity of the provision limiting the period of IBM's liability to one year following the accrual of the cause of action. Catamore, not surprisingly, complains that it is unfair for IBM to attempt so to curtail its risks and liabilities. The short answer to their complaint is such clauses, providing the time limitation is reasonable, are valid under New York law. *Soviero Bros. Contr'g Corp. v. City of New York,* 286

App.Div. 435, 142 N.Y.S.2d 508 (1st Dep't 1955), *aff'd,* 2 N.Y.2d 924, 161 N.Y.S.2d 888, 141 N.E.2d 918 (1957). We observe that a small consumer may often be required to deal with a large supplier on the latter's terms—perhaps the forces of competition are the only check to one-sided dealings. In any case, it seems to us that when a supplier and its customer, neither of whom is helpless in the marketplace, agree on terms limiting the period of liability for future services to one year, those terms must be respected. We, therefore, hold that the district court erred in permitting the jury to find both that the SES agreement was valid and that IBM was liable to Catamore for having breached the two oral agreements.

At the second trial, Catamore may attempt to escape the limitations in the SES agreement by establishing that it was induced to enter into it by fraud. We do not rule out the possibility that the trial court might permit a jury to find fraud in the inducement only insofar as the SES agreement affects actions to recover under the 1968 oral agreement. Catamore may also attempt to recover on a negligence theory. We reemphasize that we are expressing no opinion on the merits of these alternative theories of recovery.

Finally, we realize that there are hotly contested issues concerning damages—such as the sufficiency of the basis for projecting lost profits, proximate cause, duplication and confusion, and adequacy of instructions. Without scrutinizing these in detail, we limit ourselves to suggesting that in any future retrial, exhibits such as charts be prepared so to minimize, if not avoid entirely, speculation that any elements of damages had been double counted. A jury is, in a case like this, given quite enough of a task without being unnecessarily confused.

21. Moreover, we see these facts as governed by *Level Export Corp. v. Wolz, Aiken & Co.,* 305 N.Y. 82, 111 N.E.2d 218 (1953), where a buyer was held bound, by a reference in its contract, to "Standard Cotton Textile Sales note", to the arbitration provisions therefor, despite its contention that it was not a party to such Sales note. The court held that one who signs such an agreement is, in the absence of fraud, conclusively presumed to know and assent to the terms so incorporated.

22. The headings are: "Services, Term, Charges, Control and Supervision, Confidentiality, Rights in Data, Personnel, Service Estimates [referred to in text], Limitation of Liability and General."

*The judgment is vacated and the cause remanded for a new trial.*