**LOGAN EQUIPMENT CORP., Plaintiff,**

v.

**SIMON AERIALS, INC., Simon Engineering, P.L.C., Defendants.**

**Civ. A. No. 87–156–WF.**

United States District Court, D. Massachusetts.

May 10, 1990.

tion of matters that could not have been combined in a single proceeding."); Restatement (Second) of Judgments, § 26, comment c.

M. Robert Queler, Avratin, Okstein, Queler & White, Wellesley, Mass., for plaintiff.

Zachary Karol, Bingham, Dana & Gould, Boston, Mass., and Gregory G. Wille, Gibbs, Roper, Loots & Williams, Milwaukee, Wis., for defendants.

## MEMORANDUM AND ORDER

WOLF, District Judge.

Plaintiff Logan Equipment Corp. ("Logan") brought this action on January 21, 1987 against defendant Simon Aerials, Inc. ("SAI"), a Wisconsin corporation, and Simon Engineering, P.L.C., its British parent (collectively "Simon"). Plaintiff charges breach of contract, breach of warranty, misrepresentation, negligence, interference with contractual relationships, and violation of M.G.L. c. 93A in connection with a contract for defendant SAI, an equipment manufacturer, to supply plaintiff, an equipment distributor, with eight specially-designed 80–foot boomlifts. Plaintiff seeks recovery for lost profits, loss of reputation and other consequential damages.

Defendants have moved for summary judgment on all counts of the complaint and on the issue of disregard of corporate form with respect to defendant Simon Engineering. Plaintiff seeks partial summary judgment on liability under the breach of contract and breach of warranty claims. Plaintiff has also moved for leave to amend its complaint to include a civil RICO claim and to extend discovery by 90 days to accommodate discovery on this claim. For the reasons stated below, the court grants defendants' motion for summary judgment on all counts and denies plaintiff's motions for partial summary judgment and to amend.

## I. FACTS

Except where otherwise noted, the following facts are not in dispute. Sometime in mid–1984, Frank Rich, one of the principals of Logan Equipment Corp., became interested in procuring and marketing boomlifts with full-hydraulic control systems, in contrast to the electric-over-hydraulic controls which were the industry standard at the time. Rich learned that SAI had constructed three 42–foot full-hydraulic boomlifts for Ontario Hydro in Canada. Deposition of Frank Rich at 66–67 (July 17, 1987).[1]

In June, 1984, Rich and one of Logan's engineers travelled to Toronto to inspect the Ontario Hydro boomlifts. F. Rich Dep. at 71–72. They were accompanied by George Rogers, an Ontario Hydro engineer, and Alistair Robertson, an SAI representative. They tested one of the lifts and were impressed with its operation. *Id.*

During the inspection, Rich was told that SAI had added some counterweight to the Ontario Hydro machines to ensure their stability and their compliance with Canadian industry safety standards. F. Rich Dep. at 118 (appended to Defendants' Supplemental Memorandum for Summary Judgment on Counts III and IV (hereinafter "Def.Supp.Mem.")). In fact, SAI had added 2,000 pounds of counterweight to each

---

1. Unless otherwise noted, all cited portions of depositions and deposition exhibits are found in the Appendix to Defendants' Motion for Summary Judgment (hereinafter "Def.App."). Hereinafter, all references to depositions are designated as "Dep."

machine shortly after their delivery in 1982. Dep. of Albert Stephens at 107 (appended to Def.Supp.Mem.). The machines functioned safely and effectively following this modification. *Id.* at 106–07. Rich was also told that the units had been modified from SAI's basic model in several ways to satisfy Ontario Hydro's particular needs. F. Rich Dep. at 118 (appended to Def.Supp. Mem.).

During the visit, Rich spoke with Rogers and Robertson about the possibility of installing the full-hydraulic control system on an 80–foot boomlift, a substantially larger machine. Both men stated that they could see no problem with incorporating the full-hydraulic controls in SAI's standard 80–foot lift. F.Rich Dep. at 88–89, 124. Rogers stated that Ontario Hydro had been told by another equipment manufacturer that an 80–foot full-hydraulic boomlift could be constructed. *Id.* at 88. Rich later spoke by phone with Albert Stephens, another SAI employee, who also believed that the full-hydraulic controls could be incorporated in SAI's standard 80–foot unit, although he informed Rich that SAI had not previously done so. Stephens Dep. at 113 (appended to Def.Supp.Mem.).

Rich left Toronto feeling that SAI could provide him with a full-hydraulic 80–foot boomlift immediately. F.Rich Dep. at 124. Rich relied on the statements of Rogers and Robertson and on the apparent efficacy of the Ontario Hydro lifts in forming this belief. Rich, however, knew that a wide range of parameters could affect the design of a boomlift, such as the boom length, body weight, wheel base, and so forth. *Id.* at 107–12.

At that time, Rich was not aware that SAI had *two* standard 80–foot models, an unrestricted side-reach unit with extendable axles for increased stability (the "MPE–80") and a restricted side-reach unit with fixed axles (the "MP–80").[2] F. Rich Dep. at 123, 168–69 (appended to Def.Supp. Mem.). Rich had never seen the fixed-axle model. *Id.* at 123. He did not know the exact characteristics or technical specifications of either machine. *Id.* at 169–70, 197.

Logan's principals, Frank and Bryan Rich, met with SAI's representatives in September, 1984 at Logan's Shrewsbury, Massachusetts headquarters. The parties discussed the possibility of Logan becoming a Simon distributor and also talked about the 80–foot boomlifts on a general level. No formal distributorship agreement was ever executed. Dep. of Bryan Rich at 61–65 (Sept. 29, 1987).

On November 8, 1984, the parties met again at SAI's offices in Milwaukee, Wisconsin. At this meeting, the parties discussed specifications for two different full-hydraulic 80–foot boomlifts, one which Logan wanted to bid on a contract for the Philadelphia Navy Yard and one which it wanted for its everyday sale and rental business. B. Rich Dep. at 69–76. The Riches relied heavily on SAI's supposed design and engineering expertise in developing the specifications for these lifts. *Id.* at 71–76, 82 (appended to Logan's Further Memorandum Regarding Summary Judgment (hereinafter "Pl.Supp.Mem.")). The specifications did not conform exactly to either of SAI's standard 80–foot models, but, at least for the latter machines, were closer in nature to the fixed-axle unit. *Id.* Terry Smith, SAI's president, encouraged Logan to order a restricted side-reach machine, giving his "personal guarantee" that it would be "failproof" or "fool-proof" and that "nobody will have a problem with it." *Id.* at 76, 82. Smith made these comments when one of SAI's own employees expressed doubt about the feasibility of the project. *Id.* at 82–83.

Shortly after the November 8 meeting, Logan submitted a written purchase order for eight 80–foot full-hydraulic boomlifts incorporating the specifications agreed on in Milwaukee. F. Rich Dep. at Ex. 16. The order called for delivery of the first machines in January, 1985. SAI mailed to Logan eight separate acknowledgements of the order, dated December 4, 1984, each

---

**2.** In a restricted side-reach unit, the boom cannot be lowered beyond a certain angle when it is fully extended over the body of the lift. The MPE–80 is not restricted in this manner, because the extendable axles provide greater stability for the machine.

repeating the specifications and delivery dates on its face. F. Rich Dep. at Ex. 17. Each acknowledgement also bore the following legend in conspicuous type at the bottom center of its face:

THIS IS AN ACKNOWLEDGEMENT OF YOUR RECENT ORDER. PLEASE CHECK THE ABOVE INFORMATION CAREFULLY. IF ANY INFORMATION DEVIATES FROM ORIGINAL ORDER PLEASE NOTIFY US IMMEDIATELY!

THIS ORDER IS SUBJECT TO THE TERMS AND CONDITIONS PRINTED ON THE BACK HEREOF WHICH ARE AGREED TO AND MADE A PART OF THIS ORDER.

Included in the terms and conditions on the reverse, in small, but legible print, are the following:

**17. Limited Warranty:** The Company "Limited Warranty" undertakes that the Goods will be manufactured from good quality material and will be of sound design and workmanship, and it will make good by the supply of a replacement part, defects which under proper use appear in the Goods within a period of twelve (12) months from the date of delivery thereof and arise solely from faulty materials, workmanship or design (other than a design made, furnished or specified by the Buyer); provided always that defective parts have been promptly returned to the Company for the Company's inspection and final determination of its coverage under Warranty....

The Company's liability under this Condition shall be in lieu of any warranty or condition implied by law as to the quality or fitness for any particular purpose of the Goods, and save as provided in this Condition, the Company shall not be under any liability, whether in contract, tort or otherwise, in respect of defects in the Goods or for any injury, damage or loss resulting from such defects or from any work done in connection therewith.

**20. Agents and Distributors:** No person, firm or company acting as agent or distributor on behalf of the Company is authorized to make any representation or give any warranty or guarantee on behalf of the Company other than such as is contained in these Conditions.

**21. Liabilities:** The Company shall not be liable to the Buyer by way of indemnity or by reason of any breach of the Contract for loss of use (whether complete or partial) of the Goods or of profit or of any contract that may be suffered by the Buyer.

Logan did not protest any of these conditions. F. Rich Dep. at 237; B. Rich Dep. at 92–93.

Following receipt of SAI's acknowledgements, Logan proceeded to promote the sale and rental of the boomlifts, using what SAI claims was an unauthorized modification of SAI's specification sheet for its standard MP–80 model. Logan solicited a number of sales at a price of $161,000 per unit, and also solicited rental agreements at a rate of $7200 per month. F. Rich Dep. at Ex. 18–21.

The first boomlift was not delivered until February, 1985, one month after the delivery date specified for the first three machines. The lift evidenced certain design and safety problems, primarily because the safety switch restricting the boom's sidereach either malfunctioned or was never connected. Stephens Dep. at 171 (appended to Def. Supp. Mem.). Logan also complained that the full-hydraulic controls were "sluggish" and that there were problems with the unit's four-wheel drive. B. Rich Dep., Vol. 2, at 48–49 (Sept. 30, 1987). It is disputed whether SAI was aware of these problems when it shipped the machine to Logan. *Id.* at 46–47; *Id.* at 43–45 (appended to Def. Supp. Mem.); Affidavit of Michael Cannestra at ¶ 5 (June 1, 1988) (appended to Defendants' Reply Memorandum in Opposition to Cross–Motion for Summary Judgment).

Logan ordered SAI to take back the machine. B. Rich Dep., Vol. 2, at 47, 60. SAI admitted that the machine was malfunctioning, and Terry Smith promised that "we'll make it right." *Id.* at 47. However, the original machine was never repaired

and returned.[3] Rather, the parties renegotiated their deal to call for the development of an unrestricted side-reach machine. The specifications for this new unit were finalized on March 28, 1985, although no new contract or formal specification sheet was drawn up. *Id.* at 61–66; F. Rich Dep., Vol. 2, at 122–39 (Sept. 28, 1987). Logan continued to solicit orders for the 80–foot lifts and received orders from three customers for ten machines at a price of $155,000 per unit. F. Rich Dep., Vol. 2, at 90, Ex. 63, 66, 67, 75, 77.

SAI worked on the new model through the summer of 1985. In June, 1985, Smith sent a letter to Logan stating, "I cannot excuse SAI for the delay after delay, however, this is now a complete new machine from the ground up when the parameters for performance were finalized." Appendix Submitted with Logan's Opposition to Simon's Motion for Summary Judgment and Logan's Motion for Partial Summary Judgment at B (hereinafter "Logan's App."). Logan began to receive complaints and cancellations from potential purchasers of the boomlifts and, at least in one case, rented a standard MPE–80 at SAI's expense to cover a customer's needs while the new prototype was being developed. B. Rich Dep., Vol. 2, at 85; B. Rich Dep., Vol. 3, at 101–04 (Dec. 17, 1987); F. Rich Dep., Vol. 2, at 97, Ex. 78.

SAI finished the new prototype in September, 1985 and the Riches and other Logan employees traveled to Milwaukee to inspect it. B. Rich Dep., Vol. 3, at 13–18 (appended to Pl.Supp.Mem.). The unit proved to be overweight and otherwise incompatible with Logan's needs. *Id.* The parties discussed further modifications during September and October, but no definite, mutual understanding was reached. On November 21, 1985, Smith sent an internal memorandum to Simon Engineering noting that discussions with Logan were ongoing, but that sometime after July 1, 1985, Simon had begun to focus on another full-hydraulic design while "back-pedaling on the Logan project." Logan's App. at A. Logan

was never notified of this "back-pedaling" and no further prototype was ever constructed.

The parties did not communicate further until the late spring of 1986, when Logan sent several invoices to SAI covering the rental of MP–80s for Logan's customers during the period when the September prototype was being developed. In a letter dated June 4, 1986, SAI informed Logan that it was cancelling Logan's order and that it had all along considered the order contingent on SAI's ability to develop a satisfactory machine. Verified Complaint at ¶ 15, Ex. L (January 21, 1987).

On August 28, 1986, Logan made demand on SAI pursuant to M.G.L. c. 93A for $1,921,400 in direct costs and consequential damages for lost profits and harm to Logan's commercial reputation. Verified Complaint at ¶ 16, Ex. N. SAI offered a settlement of $17,569.90, which included $7,569.90 owed by Logan to SAI for open account parts purchases. *Id.* at ¶ 16, Ex. O. On January 21, 1987, Logan filed the present suit, seeking recovery under several theories for lost profits and injury to its business reputation in the amount of $7,500,000. In this suit, Logan seeks recovery only for consequential, not direct, damages.

## II. DISCUSSION

### A. *Summary Judgment Standard*

The court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which provides that the court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In addition, "the court must look at the record in the light most favorable to the party opposing the motion and must indulge all

---

**3.** Logan has repeatedly charged that SAI deliberately destroyed the prototype and all records relating to it in order to cover up its mistakes.

Logan has not, however, identified any evidence in the record to support this allegation.

inferences favorable to that party." *Stepanischen v. Merchants Despatch Trans. Corp.*, 722 F.2d 922, 928 (1st Cir.1983).

However, to survive a summary judgment challenge on the basis of disputed material facts, the plaintiff must produce substantial evidence, going beyond the allegations of the complaint and supporting the claimed dispute, which would require a judge or jury to resolve the conflicting versions of the truth at trial. *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). *See also Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986) (opponent must "do more than simply show that there is some metaphysical doubt as to the material facts").

In deciding motions for summary judgment, the court must make two inquiries: (1) whether the factual disputes are genuine, and (2) whether any fact genuinely in dispute is material. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* To determine if the dispute about a material fact is "genuine," the court must decide whether "the evidence is such that a reasonable [fact-finder] could return a verdict for the nonmoving party." *Id.* The party opposing the motion must "provide the court with 'some indication that he can produce the requisite quantum of evidence to enable him to reach the jury with his claim.'" *Arsenault v. Allegheny Airlines*, 485 F.Supp. 1373, 1378 (D.Mass.1980) (quoting *Hahn*, 523 F.2d at 468).

B. *Application of the Summary Judgment Standard to this Case*

1. The Breach of Contract Claim

■ The defendants contend that they are entitled to summary judgment on plaintiff's breach of contract claim because (1) plaintiff is barred from recovering consequential damages under the terms of their contract, (2) plaintiff failed to take reasonable actions to mitigate its consequential damages, such as renting or buying replacement lifts for its customers, and (3) plaintiff waived its rights to recovery under the original contract by entering into an unenforceable superseding contract calling for the design and construction of a fundamentally different machine. Because the court agrees with defendants' first contention, it does not decide the second and third issues.

Under Massachusetts law, a commercial contract incorporates all terms included in an acknowledgement of a purchase order, as long as the buyer does not object to the additional conditions or otherwise withdraw its order. *Alloy Computer Products, Inc. v. Northern Telecom, Inc.*, 683 F.Supp. 12, 14 (D.Mass.1988); *Roto–Lith, Ltd. v. F.P. Bartlett & Co.*, 297 F.2d 497, 500 (1st Cir. 1962). In this case, neither party disputes that the limited warranty and limitation on liabilities provisions of the acknowledgements became part of the original sales contract between Logan and SAI, subject only to their enforceability under the Uniform Commercial Code.

M.G.L. c. 106, § 2–715, the Massachusetts codification of the Uniform Commercial Code, permits a buyer to recover incidental and consequential damages caused by a seller's breach. However, section 2–719(3) of the Code allows the parties to limit or exclude such recovery unless the limitation is unconscionable. *Canal Electric Co. v. Westinghouse Electric Corp.*, 406 Mass. 369, 373–74, 548 N.E.2d 182 (1990); *Delano Grower's Coop. Winery v. Supreme Wine Co.*, 393 Mass. 666, 683–84, 473 N.E.2d 1066 (1985). Limitations on recovery of consequential damages in a corporate context represent "a reasonable accommodation between two commercially sophisticated parties" which does not offend any public policy of the state. *Canal Electric*, 406 Mass. at 374, 548 N.E.2d 182.

Paragraph 21 of the terms and conditions included in SAI's acknowledgments expressly excludes defendants' liability for consequential damages. The court has been presented with no evidence showing that this provision is unconscionable. Rather, the term appears to be a valid and reasonable allocation of commercial risk, especially in light of the somewhat "experimental" nature of the boomlift ordered. "[T]he agreed-upon allocation of commercial risk should not be disturbed ... where ... the warranted item is a highly complex, sophisticated, and in some ways experimental piece of equipment." *American Electric Power Co. v. Westinghouse Electric Corp.*, 418 F.Supp. 435, 458 (S.D.N.Y.1976) (quoted in *Canal Electric*, 406 Mass. at 375, 548 N.E.2d 182). Thus, under the original contract between the parties, SAI cannot be held liable for consequential damages on a breach of contract theory.

An identical result is achieved by paragraph 17, the limited warranty provision, which states in part:

> The Company's liability under this Condition shall be in lieu of any warranty or condition implied by law as to the quality or fitness for any particular purpose of the Goods, and *save as provided in this Condition, the Company shall not be under any liability, whether in contract, tort or otherwise,* in respect of defects in the Goods or *for any injury, damage or loss resulting from such defects or from any work done in connection therewith.* (emphasis added).

In *Canal Electric*, the Massachusetts Supreme Judicial Court held that virtually identical language in an electrical equipment contract precluded recovery of consequential damages in plaintiff's breach of warranty action. 406 Mass. at 375, 378 n. 8, 548 N.E.2d 182. The Court in *Canal Electric* ruled that the disclaimer was enforceable even though the limited repair remedy allegedly failed of its essential purpose. *Id.* In this case, where plaintiff has not even raised the issue of failure of purpose of the limited remedy, it is clear that consequential damages are excluded and that defendants are entitled to summary judgment on plaintiff's breach of contract claim as a matter of law and undisputed fact.[4]

### 2. The Breach of Warranty Claim

Plaintiff charges that the defendants, through their delivery of a defective boomlift, breached both the implied warranty of merchantability and an express warranty created by their exhibition and demonstration of the Ontario Hydro lift. As suggested above, plaintiff's recovery of consequential damages on a breach of warranty theory is precluded by the limitations clauses included in SAI's acknowledgements, even if a breach occurred. *Canal Electric*, 406 Mass. at 375, 548 N.E.2d 182; M.G.L. c. 106 § 2–316(4). In addition, plaintiff's claim founders on the facts of this case and on the disclaimer of warranties incorporated in paragraph 17 of SAI's acknowledgements, which amply establish that no

---

**4.** An issue remains as to the rights of plaintiff to recover under the March, 1985 agreement between the parties, under which defendant attempted to design and construct an unrestricted side reach machine. The parties alternately characterize this agreement as a modification of the original contract, as a failed accord and satisfaction, and as a waiver and superseding contract. Regardless of the agreement's status, the court is satisfied that it could not and did not expand the remedies available to plaintiff. If it was a modification of the original contract, plaintiff would be restricted to its rights under the purchase order and acknowledgements, which include the limited remedy and liability provisions. *International Business Machines v. Catamore Enterprises*, 548 F.2d 1065, 1074 (1st Cir.1976) (limitations clause in written contract

applied to prior and subsequent oral contracts between the parties). The same is true if it was an accord and satisfaction which had never been performed. *V. & F.W. Filoon Co. v. Whittaker Corp.*, 12 Mass.App.Ct. 932, 933, 425 N.E.2d 399 (1981). Alternatively, if the agreement did constitute a waiver and superseding contract, both plaintiff and defendant agree that it would be unenforceable under the statute of frauds. M.G.L. c. 106 § 2–209; Memorandum in Support of Defendants' Motion for Summary Judgment at 24; Plaintiff's Opposition to Defendants' Motion for Summary Judgment and Cross–Motion for Partial Summary Judgment at 9. Therefore, plaintiff would again be limited, at best, to its rights under the original agreement.

breach of an enforceable warranty took place.

■ Exclusion of implied warranties is governed by M.G.L. c. 106, § 2–316, which states in relevant part:

(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous....

(3) Notwithstanding subsection (2)

(a) unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is", "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty....

Conspicuous disclaimers or limitations on warranties will only be ignored when unconscionable. *Marcil v. John Deere Industrial Equipment Co.,* 9 Mass.App.Ct. 625, 629, 403 N.E.2d 430 (1980). This court finds that the disclaimer in paragraph 17 of SAI's acknowledgment was conspicuous, not unconscionable and sufficient to exclude the implied warranty of merchantability.

■ The term "conspicuous" is defined in M.G.L. c. 106, § 1–201 to mean a "term or clause ... so written that a reasonable person against whom it is to operate ought to have noticed it." Whether or not a term is conspicuous is a decision for the court. *Id.* In making this determination, the court takes into account the location of the clause, the size of the type, any special highlighting, such as boldface, capitalization or underlining, the clarity of the clause, and the sophistication of the contracting parties. *Gilbert & Bennett Mfg.*

Co. v. Westinghouse Electric Corp., 445 F.Supp. 537, 547 (D.Mass.1977).

In this case, each of the eight acknowledgements stated in readable boldface on its front that the order was subject to the terms and conditions printed on its reverse. *See Marcil,* 9 Mass.App.Ct. at 626–27, 403 N.E.2d 430 (disclaimer enforced where printed on reverse side of purchase order and referenced on front). The print on the reverse was small, but legible, and the individual terms were numbered and prefaced by boldfaced titles. *See Transurface Carriers, Inc. v. Ford Motor Co.,* 738 F.2d 42, 44 (1st Cir.1984) (disclaimer enforced where printed in small letters on front of purchase order and prefaced by boldface, capitalized caption). Paragraph 17 was prefaced by the title, "Limited Warranty." The parties to the contract were not commercial innocents. The title of the clause and the clear language of the clause were conspicuous and should have put the plaintiff on notice that defendant was excluding the warranties of fitness and merchantability otherwise implied under law.[5]

■ Plaintiff bases its express warranty claim on the June, 1984 demonstration to Frank Rich of the 42–foot full-hydraulic boomlift which SAI had constructed for Ontario Hydro. Plaintiff argues that the Ontario Hydro unit created a warranty by sample upon which it relied in ordering its own 80–foot full-hydraulic units.

The difficulty with plaintiff's argument is that the significant physical differences between the Canadian machine and the ones Logan ordered, as well as Rich's own knowledge that a boomlift's design varies greatly with such characteristics as its boom length and weight, precludes any finding that the Ontario Hydro unit created an express warranty for the 80–foot lifts. *Automated Controls, Inc. v. MIC Enterprises,* 599 F.2d 288 (8th Cir.1979), and *Regina Grape Products Co. v. Supreme*

---

5. The court recognizes that paragraph 17 does not explicitly mention "merchantability" as is often, but not always, required by M.G.L. c. 106, § 2–316(2). However, its statement that "[t]he Company's liability under this condition shall be in lieu of any warranty or condition implied by law as to the quality or fitness for any

particular purpose of the Goods ..." seems to the court to constitute language which in common understanding would plainly notify the buyer that all implied warranties were being excluded. Thus, the implied warranty of merchantability is validly disclaimed under M.G.L. c. 106, § 2–316(3).

*Wine Co., Inc.*, 357 Mass. 631, 634–35, 260 N.E.2d 219 (1970), cited by plaintiff in support of its contention, are distinguishable on this basis. In both those cases, the samples creating the express warranty were identical to the ordered goods.

■ Alternatively, any express warranty which may have been formed by Rich's inspection of the Ontario Hydro unit was necessarily superseded by the specifications negotiated by the parties in November, 1984 and expressly set out in both the purchase order and the acknowledgements. In reaching this conclusion the court relies on the reasoning of the Court of Appeals for the First Circuit in *Turner v. Johnson & Johnson*, 809 F.2d 90 (1st Cir.1986), a case involving claims of fraud rather than breach of express warranty:

> [A] contractual provision flatly contradictory to prior oral assurances should cause most people—and particularly experienced, knowledgeable businesspeople—to pause.... [I]f a jury is allowed to ignore contract provisions directly at odds with oral representations allegedly made during negotiations, the language of a contract simply would not matter anymore.... Contracts would become no more than presumptive statements of the parties' legal intentions, instead of legally enforceable agreements. And the give-and-take of negotiations would become meaningless if, after making concessions in order to obtain other contractual protections, a knowledgeable party is later able to reclaim what it had given away by alleging that it had, in fact, relied not on the writing but on the prior oral statements.

809 F.2d at 96. While plaintiff may well have taken the Ontario Hydro boomlift as an example of SAI's skill and expertise in the equipment design field, the 42–foot unit cannot have created an express warranty which survived the generation of a new set of agreed-upon specifications for Logan's proposed 80–foot machine.

For the foregoing reasons, defendants are entitled to summary judgment on plaintiff's claims for breach of express and implied warranties.

### 3. The Negligence Claim

■ Under Massachusetts law, a plaintiff may not recover in negligence for purely economic harms, such as lost profits and harm to business reputation. *Bay State–Spray & Provincetown Steamship, Inc. v. Caterpillar Tractor Co.*, 404 Mass. 103, 107, 533 N.E.2d 1350 (1989). A contrary rule would allow contracting parties to escape the comprehensive and universal legal framework established by the Uniform Commercial Code, frustrating the commercial expectations of their partners. *Marcil*, 9 Mass.App.Ct. at 631–32, 403 N.E.2d 430. Thus, the court must grant summary judgment for defendants on plaintiff's negligence cause of action.

### 4. The Interference With Contractual Relations Claim

■ The elements of the tort of interference under Massachusetts law were set out in *Chemawa Country Golf, Inc. v. Wnuk*, 9 Mass.App.Ct. 506, 402 N.E.2d 1069 (1980):

> (1) intentional and willful acts (2) calculated to cause damage to the plaintiffs in their lawful business, (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendant, (which constitutes malice), and (4) actual damage and loss resulting.

*Id.* at 509, 402 N.E.2d 1069 (quoted in *Kazmaier v. Wooten*, 761 F.2d 46, 51 (1st Cir. 1985)). Although the Massachusetts Supreme Judicial Court recently abandoned the requirement of malice, actual or presumed, as an element of the tort, it confirmed that "more than intentional interference must be established." *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 816, 551 N.E.2d 20 (1990). The interference must be wrongful by some standard beyond the fact of interference itself, involving an improper motive or means on the part of defendant. *Id.* (affirming directed verdict for defendant where no impropriety shown). Where no reasonable jury could find an improper motive or means from the evidence on record, sum-

mary judgment is appropriate. *Cf. Kazmaier,* 761 F.2d at 52.

In the present case, the record establishes, at most, that defendants breached their contract with plaintiff and that plaintiff's other business affairs suffered incidentally as a result. No allegation is made or proof offered that defendants intended to cause plaintiff to breach its other contracts by their acts or omissions. Even if defendants knew that plaintiff had contracted to sell the ordered 80–foot boomlifts, the incidental and non-purposeful breach of these third-party contracts flowing from defendants' breach would not satisfy the legal requirements of the tort. Rather, plaintiff must show that the defendants directly undertook to cause breaches of the third-party agreements. *Araserv, Inc. v. Bay State Harness,* 437 F.Supp. 1083 (D.Mass.1977). Plaintiff has completely failed to allege, let alone offer evidence to place in genuine dispute, a claim that defendant acted through improper motives or means in causing breaches of the third-party contracts.

Plaintiff's reliance on *Grammenos v. Zolotas,* 356 Mass. 594, 254 N.E.2d 789 (1970), is misplaced. That case held that the element of malicious intent could be satisfied without a showing of actual malice if the interference with the third-party contract was knowing, intentional and without lawful justification. *Grammenos* did not alter the requirement that a defendant's actions must be purposefully directed at causing a breach of the third-party contract to give rise to a claim in tort.

### 5. The Misrepresentation Claim

■ In Massachusetts, a plaintiff may establish liability by proving an intentional, negligent or innocent misrepresentation underlying the formation of a contract. Liability may not be found under these theories where the alleged misrepresentation concerned a matter of opinion, estimate or judgment, which was not susceptible of actual knowledge at the time of its utterance. *Snyder v. Sperry & Hutchinson Co.,* 368 Mass. 433, 444, 333 N.E.2d 421 (1975).

■ To succeed on a claim of misrepresentation, a plaintiff must show that "the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage." *Danca v. Taunton Savings Bank,* 385 Mass. 1, 8, 429 N.E.2d 1129 (1982) (quoted in *Kennedy v. Josephthal & Co.,* 814 F.2d 798, 805 (1st Cir.1987)). However, plaintiff does not have to prove an actual intent to deceive, *Snyder,* 368 Mass. at 444, 333 N.E.2d 421, and "nothing is clearer than the fact that under Massachusetts law plaintiffs need not prove that [defendant] knew his statements to be false," *Nickerson v. Matco Tools Corp.,* 813 F.2d 529, 530 (1st Cir. 1987).

"In this Commonwealth it has been held in a long line of cases that 'the charge of fraudulent intent, in an action for deceit, may be maintained by proof of a statement made, as of the party's own knowledge, which is false, provided the thing stated is not merely a matter of opinion, estimate, or judgment, but is susceptible of actual knowledge; and in such case it is not necessary to make any further proof of an actual intent to deceive.'"

*Nickerson,* 813 F.2d at 530 (quoting *Powell v. Rasmussen,* 355 Mass. 117, 118, 243 N.E.2d 167 (1969) (quoting *Chatham Furnace Co. v. Moffat,* 147 Mass. 403, 404, 18 N.E. 168 (1888))).[6]

Certain rules of law are common to all three theories of intentional, negligent or innocent misrepresentation. For example, the alleged misrepresentations must be identified with specificity to survive a motion to dismiss or for summary judgment. "Vague and conclusory allegations that [defendant] 'expressly and by its conduct'

---

**6.** The elements of innocent misrepresentation are virtually identical to those set forth for negligent misrepresentation. *See Yorke v. Taylor,* 332 Mass. 368, 371, 124 N.E.2d 912 (1955). The former theory has generally been employed only in cases where rescission of a contract rather than compensatory damages are sought. *Id.; Pepsi–Cola Metro. Bottling Co. v. Pleasure Island, Inc.,* 345 F.2d 617 (1st Cir.1965).

misrepresented its true intent ... are insufficient to support the claim." *Spencer Cos. v. Chase Manhattan Bank*, 81 B.R. 194, 202 (D.Mass.1987).

In addition, mere nondisclosure generally will not support any cause of action for misrepresentation. *Nei v. Burley*, 388 Mass. 307, 310–11, 446 N.E.2d 674 (1983) (no fraud where vendors failed to disclose existence of seasonal stream on property, where they had provided buyer with percolation report showing presence of excessive water and where buyer made no further inquiry). However, "a party who discloses partial information that may be misleading has a duty to reveal all the material facts he knows to avoid deceiving the other party." *V.S.H. Realty, Inc. v. Texaco, Inc.*, 757 F.2d 411 (1st Cir.1985).

Finally, as noted above, statements of opinion or judgment relating to future events are generally not actionable. However, several exceptions exist to this rule. First, such statements may be actionable where the defendant misrepresents his actual present intent to perform a future act. *Barrett Associates, Inc. v. Aronson*, 346 Mass. 150, 152, 190 N.E.2d 867 (1963). Second, such statements may be actionable where the parties have unequal knowledge of the subject matter in question and where the future event is fully within the declarant's control. This is the case, for example, where a corporate representative promises that his principal will sign a contract with the plaintiff and the principal fails to do so, *Cellucci v. Sun Oil Co.*, 2 Mass. App.Ct. 722, 730, 320 N.E.2d 919 (1974), or where a corporation falsely assures a plaintiff that its subsidiary will be adequately capitalized, *Gopen v. American Supply Co.*, 10 Mass.App.Ct. 342, 345, 407 N.E.2d 1255 (1980).

In the present case, plaintiff has alleged five separate statements and omissions as the basis for its misrepresentation cause of action. The court finds that three of these are plainly deficient as a matter of law and uncontroverted fact and that the remaining two comprise nothing more than non-actionable statements of strong belief.

The first alleged misrepresentation was Alistair Robertson's failure to inform Logan that the Ontario Hydro boomlift did not conform to its written specifications. This claim fails on several grounds. First, plaintiff has presented no evidence that the written specifications for the Canadian machine were ever presented to or discussed with Logan. Under these circumstances, defendant was not required to disclose any variances in the unit's actual parameters to plaintiff. *Nei*, 388 Mass. at 310–11, 446 N.E.2d 674.

Second, the record unambiguously reflects that Frank Rich learned during his visit to Toronto that the Ontario Hydro boomlifts had been modified from Simon's standard specifications in several ways, including the addition of extra counterweight. Rich's testimony not only establishes that no misrepresentation occurred, but also demonstrates that plaintiff could not reasonably have relied on the unit's written specifications in any way.

Third, although SAI may have used the 42–foot Canadian machine to demonstrate its competence and expertise to Logan, and to display the qualities of SAI's new full-hydraulic control system, the unit's exact written specifications could not have been material to Logan's decision to order the 80–foot boomlifts. Frank Rich knew that the boom length, size and weight of a lift would affect the lift's overall specifications. The court finds that a reasonable jury would have to conclude that plaintiff necessarily depended on the conformance of its machines to the specifications developed in November, 1984 and expressed in the original purchase order, not on the undisclosed specifications of the smaller Ontario Hydro unit. *See Turner*, 809 F.2d at 97 ("plaintiffs may not raise as fraudulent any prior oral assertion inconsistent with a contract provision that specifically addressed the particular point at issue").

The second alleged misrepresentation was Robertson's failure to disclose that the Canadian lift did not conform to industry safety standards. Unlike the specifications issue discussed immediately above, Robertson may have been under a

duty to disclose any such information, because the record reflects that Frank Rich was told that the unit exceeded applicable safety standards in some regards. *See V.S.H. Realty,* 757 F.2d at 414 (full disclosure may be required where partial disclosure would be misleading). However, plaintiff has not produced, and the court has not found, any evidence that the Canadian machine did not meet industry safety standards once supplemental counterweight was added. To the contrary, the court finds unrebutted testimony in the record that the unit performed safely and effectively once this alteration was made. In addition, the reasoning of *Turner* is applicable to this alleged nondisclosure as well. Logan relied on SAI to build a safe and conforming 80–foot machine according to the specifications incorporated in the November, 1984 purchase order. The critical aspect of the Ontario Hydro lift, as far as Logan was concerned, was its full-hydraulic control system, not its size and weight.

■ The third alleged misrepresentation was Terry Smith's promise, in his June 11, 1985 letter to plaintiff, that SAI would build Logan "a complete new machine from the ground up." In fact, plaintiff charges, SAI was "back-pedaling" on Logan's order, as reflected in Smith's November, 1985 memorandum to SAI's corporate parent.

Plaintiff's argument fails because, read in context, Smith's statement was not a promise, which he could have contemporaneously intended to breach, but an explanation for the delays in the development of the prototype. The full sentence from the June 11, 1985 letter reads, "Frank, I cannot excuse SAI for the delay after delay, however, this is now a complete new machine from the ground up when the parameters for performance were finalized." Even if SAI was "back-pedaling" on Logan's order when this letter was written in June, a matter not clearly established by the later November memorandum, the letter does not contain any suggestion that SAI was proceeding in the most expeditious fashion on plaintiff's prototype. In fact, a prototype was produced, though not until September, 1985. The court finds the reasoning of the Court of Appeals for the First Circuit in *Chedd–Angier Production v. Omni Publications International,* 756 F.2d 930 (1st Cir.1985), an M.G.L. c. 93A case, applicable to these facts. In that case, the defendant waited 13 days before informing plaintiff that it was terminating their television production contract. The court concluded that "this delay reflects a lack of candor between the parties, rather than a violation of Chapter 93A." 756 F.2d at 939. Similarly, SAI's possible lack of complete candor here does not give rise to a cause of action for misrepresentation.

■ The last two alleged misrepresentations, Robertson's statements in Toronto that there would be no problem incorporating the full-hydraulic system into Simon's standard 80–foot lift and Smith's statements in Milwaukee that the restricted side-reach design would be "failproof" or "foolproof," present closer questions of actionability. Plaintiff was aware that Simon had not previously constructed a full hydraulic 80–foot lift. This fact was communicated to Rich by Simon's employees. The novelty of the machine was also reflected by the extended discussions over the specifications of the unit, which made it clear that Logan was not ordering an off-the-shelf model. Under these circumstances, the comments of Robertson and Smith appear to be mere statements of opinion or estimate, although perhaps strongly-worded. *Cf. Harris v. Delco Products, Inc.,* 305 Mass. 362, 365–66, 25 N.E.2d 740 (1940) (well-digger's statement that "there would be definitely no chance of striking salt water" "amount[ed] to nothing more than an expression of strong belief").

On the other hand, Robertson and Smith were in a position of superior knowledge concerning the feasibility of the proposal, and the record reflects that Logan relied heavily on their assurances and on their engineering and product-line expertise. Nonetheless, unlike the contract execution in *Cellucci* or the financing arrangements in *Gopen,* the design and construction of the lift was not completely in the control of the defendants. In those cases, the only

thing preventing fulfillment of the promised events was the defendants' own business judgments. Here, the manufacture of the lift was subject to the laws of engineering and physics as well as to defendant's own finite design and production skills. Simply put, the feasibility of the proposed 80–foot lift was a matter of opinion or judgment, not susceptible of actual knowledge until SAI actually tried to build the machine.

The court is guided in reaching this conclusion by the distinctions drawn by the Massachusetts Supreme Judicial Court in two similar misrepresentation cases decided several months apart in 1960, and not since qualified. In *Pietrazak v. McDermott*, 341 Mass. 107, 167 N.E.2d 166 (1960), the Court held that a contractor's statement "that he built a good house and that there would be no water in the cellar" was an actionable misrepresentation. The Court reasoned that "McDermott appears to have been the builder of the house and his assertion could reasonably have been understood by Mrs. Pietrazak to mean that the construction of the house was such as to preclude the entrance of water." 341 Mass. at 110, 167 N.E.2d 166. Critical to the Court's decision, however, was the fact that the house was substantially finished when the contractor made his statement and thus his representations were susceptible of actual knowledge. *Id.*

By contrast, the Court held in *Yerid v. Mason*, 341 Mass. 527, 170 N.E.2d 718 (1960), that a vendor's assurances that a drain he was installing would solve the cellar's leakage problem were non-actionable statements of opinion. 341 Mass. at 530, 170 N.E.2d 718 (citing *Harris*, 305 Mass. at 365–66, 25 N.E.2d 740). The Court distinguished *Pietrazak* on the grounds that the building in that case was "substantially completed" whereas the *Yerid* drain was in the process of being built. *Id.*

Like the drain in *Yerid*, the boomlift in the present case was not near completion when Robertson and Smith made their alleged misrepresentations. In fact, design and construction of the lift had not even truly begun. While Robertson and Smith may have believed that SAI could build the desired machine, the accuracy of these beliefs could not be ascertained as a matter of fact when they were expressed.

■ The court has also considered with particular care Bryan Rich's testimony that Smith gave his "personal guarantee" that the restricted side reach unit would function properly. In contract law, "guarantee" is a term of art that carries weightier implications than ordinary seller's talk. However, analyzed as a matter of contract law, Smith's statement encounters the contractual limits on liability discussed above with regard to the breach of contract and breach of warranty claims. In addition, the court notes that paragraph 20 of the acknowledgements provides, "No person ... is authorized to make any representation or give any warranty or guarantee on behalf of the Company other than such as is contained in these Conditions." Analyzed alternatively as a matter of tort law, as a representation made during negotiations resulting in the contract, the court finds that the use of the term "guarantee" does not alter the fundamentally predictive nature of Smith's statement.

Finally, the court finds nothing in the record to suggest that SAI did not intend to build the ordered lift or initially believed itself incapable of doing so. SAI spent several months attempting to construct the machine, producing two prototypes in the process. Especially because plaintiff has failed to allege or support any credible motivation for defendant to misrepresent its intent and capabilities, the court concludes that the statements of Smith and Robertson could not be reasonably viewed as anything more than expressions of confidence in the ability of their company. *See Turner*, 809 F.2d at 99 (summary judgment may be appropriate on misrepresentation claim where plaintiff fails to propose motive for deceit). While Smith and Robertson may have been in error (as also was Rogers, the Ontario Hydro engineer), the law creates potential liability only for misstatements of fact, not for errors in judgment.

### 6. The Chapter 93A Claim

 Mass.Gen.L. ch. 93A, § 11 creates a cause of action for business persons injured as a result of unfair methods of competition or unfair or deceptive acts or practices utilized by other commercial entities, as long as the unfair or deceptive acts occurred "primarily and substantially" within the Commonwealth of Massachusetts. The court has serious doubts whether the allegedly unfair acts and practices in this case occurred primarily and substantially within Massachusetts. Even if the alleged acts do fall within the coverage of c. 93A, however, the court concludes that plaintiff has not presented sufficient evidence of a c. 93A violation to survive defendant's motion for summary judgment.

In *Goldstein Oil Co. v. C.K. Smith Co.*, 20 Mass.App.Ct. 243, 479 N.E.2d 728 (1985), the court expressly rejected a "place of the injury" test for determining the coverage of chapter 93A, reasoning that "if adopted, it would effectively have eliminated the 'primarily and substantially' exemption in most situations, as practically every Massachusetts plaintiff would suffer injury within the Commonwealth." 20 Mass. App.Ct. at 249 n. 7, 479 N.E.2d 728; *but see Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 638–39, 473 N.E.2d 662 (1985) (finding c. 93A inapplicable in part because plaintiff's losses were sustained in New York). More recently, in *Makino, U.S.A., Inc. v. Metlife Capital Credit Corp.*, 25 Mass.App.Ct. 302, 518 N.E.2d 519 (1988), the court encouraged a "functional approach" to determining the jurisdictional scope of chapter 93A, with particular focus on "the statutory concern with commercial conduct in Massachusetts." 25 Mass. App.Ct. at 310–11, 518 N.E.2d 519. The court characterized the determination of coverage as a "process of measuring and weighing" in which the locations of business meetings, phone calls, and contract negotiations, execution and performance should all be taken into account. *Id.*

In the present case, the alleged misrepresentations which provide the primary basis for plaintiff's chapter 93A claim were made by Robertson in Toronto and Smith in Milwaukee. The design and construction of the lifts was performed entirely, or almost entirely, in Milwaukee. While one meeting between the parties was held in Shrewsbury, Massachusetts, the 80–foot boomlifts were not specifically discussed at this session, but rather at a later meeting at SAI's offices in Wisconsin. And while SAI allegedly delivered a defective prototype to Logan in Massachusetts in February, 1985, there is some evidence that the machine was flawed when it left Simon's Milwaukee plant. These circumstances are thus distinguishable from those present in *Burnham v. Mark IV Homes, Inc.*, 387 Mass. 575, 581–82, 441 N.E.2d 1027 (1982), in which the Court specifically found that the breach of warranty underlying plaintiff's chapter 93A claim was not complete until the modular homes in question were actually installed in the Commonwealth. While the contract between SAI and Logan undoubtedly had significant contacts with the Massachusetts economy, the allegedly unfair and deceptive acts comprising Logan's chapter 93A cause of action appear to have occurred "primarily and substantially" in Wisconsin and Ontario.

Even if chapter 93A can reach the acts and practices in question here, the court concludes that they are not sufficient to support a claim under that statute. In a recent opinion affirming the summary judgment dismissal of a chapter 93A cause of action, the Court of Appeals for the First Circuit reiterated the substantive standard of liability under the law:

Litigation under Mass.Gen.L. ch. 93A is rampant, but a common refrain has developed. "The objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Levings v. Forbes & Wallace, Inc.*, 8 Mass.App.Ct. 498, 396 N.E.2d 149, 153 (1979); *see also Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515–16 (1st Cir.1988) (unscrupulous or unethical conduct usually required); *Williams v. Arndt*, 626 F.Supp. 571, 581–82 (D.Mass. 1985) (similar). In other words, a chapter 93A claimant must show that the

defendant's actions fell "within at least the penumbra of some common-law, statutory, or other established concept of unfairness," or were "immoral, unethical, oppressive or unscrupulous," and resulted in "substantial injury ... to competitors or other businessmen." *PMP Associates, Inc. v. Globe Newspaper Co.,* 366 Mass. 593, 321 N.E.2d 915, 917 (1975); *accord Pepsi–Cola Metro. Bottling Co. v. Checkers, Inc.,* 754 F.2d 10, 17–18 (1st Cir.1985); *Levings,* 396 N.E.2d at 153. *Quaker State Oil Refining Corp. v. Garrity Oil Co.,* 884 F.2d 1510, 1513 (1st Cir. 1989). A chapter 93A claim may be premised on common law deceit, *Nickerson,* 813 F.2d at 531; *but see Chedd–Angier,* 756 F.2d at 939 (affirming district court's dismissal of chapter 93A claim while allowing misrepresentation count to go to the jury), or breach of warranty, *Burnham,* 387 Mass. at 581–82, 441 N.E.2d 1027; *Linthicum v. Archambault,* 379 Mass. 381, 387, 398 N.E.2d 482 (1979) ("a material and substantial breach of warranty"), but mere breach of contract is not sufficient, *Whitinsville Plaza, Inc. v. Kotseas,* 378 Mass. 85, 390 N.E.2d 243 (1979). As the Court of Appeals has observed, "the cases which dot the chapter 93A landscape tend to be fact-specific." *Quaker State,* 884 F.2d at 1514.

In addition to the alleged misrepresentations and omissions discussed in the preceding section, plaintiff's chapter 93A claim in this case is premised on defendant's delays in producing the February and September prototypes, defendant's ultimate failure to perform the sales contract, and defendant's allegedly deliberate action in sending a defective machine to plaintiff in February, 1985. Viewed individually and together, the court finds that these facts and allegations could not reasonably establish, even if proven, a "level of rascality" violative of chapter 93A.

As noted above, simple breach of contract will not support a chapter 93A claim. Nor will the less than total candor which may be inferred from the tardy production of the September prototype and the undisclosed "back-pedaling" in which SAI engaged during the summer of 1985. *Chedd–Angier,* 756 F.2d at 939.

The deliberate delivery of a faulty boomlift in February, 1985, if true, could conceivably comprise the type of unscrupulous behavior punishable by chapter 93A. However, the evidence does not suggest that such a conclusion could reasonably be reached in this case by the court, which must decide chapter 93A claims which are tried. First, Logan did not suffer "substantial injury" as a result of the faulty prototype. *PMP Associates,* 366 Mass. at 593, 321 N.E.2d 915. Logan never paid for the unit, but rather exercised its right to return the machine to SAI. The parties then renegotiated the boomlift's specifications rather than attempting a repair of the faulty model.

Second, plaintiff has not suggested an intentionally malicious motive for defendant's alleged act, although it impugns the ethics and competency of SAI's quality control and engineering personnel. To the contrary, the evidence suggests that, at worst, SAI, knowing it was a month late in delivering the first units to Logan, sent the February prototype despite doubts as to its functionality. This action would not "raise an eyebrow of someone inured to the rough and tumble of the world of commerce" in an environment in which manufacturers' recalls for design and production flaws are a frequent occurrence. As important, delivery of the allegedly faulty unit was indisputably followed by continued attempts to design and manufacture a satisfactory unit, rather than by other allegedly unfair and unscrupulous acts, further eliminating the possibility of unethical motives on the part of the defendants. *Cf. Turner,* 809 F.2d at 99.

Finally, the court notes that in *Canal Electric Co.* the Massachusetts Supreme Judicial Court held that a chapter 93A, § 11 cause of action which sought recovery of consequential damages and which was essentially duplicative of a breach of warranty claim could be barred by a contractual limitation of liability or limitation of remedy clause. 406 Mass. at 379, 548 N.E.2d 182; *see also Chestnut Hill Dev. Corp. v.*

*Otis Elevator Co.*, 653 F.Supp. 927 (D.Mass.1987) (same). As discussed above, such a provision is present and enforceable in this case. Therefore, even if SAI did materially and substantially breach its warranty to Logan by delivering a defective machine, Logan has bargained away its chapter 93A right to recovery for this wrong, and summary judgment is appropriate.

### 7. The Alter Ego Claim

■ Defendants have moved to dismiss the complaint in its entirety with respect to Simon Engineering, P.L.C., SAI's parent corporation, on the basis that the British company played no part in the transactions with plaintiff and that no reason exists to disregard the company's separate corporate identity. The court concludes that defendants' motion must be granted.

In Massachusetts, disregard of the corporate entity is permitted:

(a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their representatives are acting.

*My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 619–20, 233 N.E.2d 748 (1968) (quoted in *WJM, Inc. v. Massachusetts Dep't of Public Welfare*, 840 F.2d 996, 1009 (1st Cir.1988)).

Construed in the light most favorable to the plaintiff, the record in this case reflects no more than the following: Simon Engineering is incorporated in England, Affidavit of Joseph Mosley at ¶ 2 (Feb. 16, 1987) (appended to Def. App.); Simon Engineering has no office in Massachusetts and has never transacted business in Massachusetts, *Id.* at ¶ 5; Simon Engineering is the indirect owner of SAI, *Id.* at ¶ 3; Simon Engineering set "overall strategy" for the Simon conglomerate as a whole, Dep. of John Barker at 20 (Dec. 16, 1987); two, and at times three, officers of Simon Engineering were directors of SAI; these officers traveled to Milwaukee at least three times yearly to attend SAI board meetings, *Id.* at 22; SAI was separately incorporated and capitalized, Mosley Aff. at ¶ 4; SAI sent monthly financial and performance reports to the president of Simon Engineering, Barker Dep. at 21; Dep. of Colin Fletcher at 6–8 (Dec. 16, 1987); Simon Engineering set financial performance and budgetary objectives for SAI and, through its interlocking directors, intervened at a non-operational level when these objectives were not met, Barker Dep. at 20, 92–93; SAI employees occasionally traveled to England; SAI touted its relationship with Simon's international conglomerate in its marketing literature in general and during its negotiations with Logan in particular, B. Rich Dep. at 25; F. Rich Dep. at 54–58; SAI may have marketed and sold equipment manufactured by other Simon affiliates, F. Rich Dep. at 54–58; Frank Rich had one telephone conversation with a Simon Engineering hydraulics engineer when calling the Milwaukee office of SAI between February and September, 1985, *Id.* at 75–79; at least one internal memorandum from SAI to Simon Engineering discussed SAI's progress on the Logan project. Nothing in the record supports plaintiff's further allegations that Simon Engineering maintained and exercised the power to hire and fire employees of SAI or to select the location and finance the construction of SAI facilities.

These facts are virtually identical to those present in *Miller v. Honda Motor Co.*, 779 F.2d 769 (1st Cir.1985), in which the Court of Appeals declined to exercise personal jurisdiction over a Japanese company on the basis of its contacts with its American subsidiary. In that case, as in this, plaintiff provided no evidence that the parent controlled the day-to-day operations of the subsidiary. In addition, in both cases the subsidiary possessed its own employees, personnel and financial manage-

ment systems and product and marketing plans.

The plaintiff here has not alleged or demonstrated facts sufficient to litigate further any claim that Simon Engineering exercised pervasive control over SAI or that the Simon companies engaged in substantial disregard of their own corporate forms. *My Bread Baking Co.*, 353 Mass. at 619–20, 233 N.E.2d 748. If anything, plaintiff's references to internal corporate memoranda support the undisputed assertion of defendants that their companies observed all corporate formalities. Nor has plaintiff satisfactorily demonstrated that any fraudulent or injurious consequence flowed from the relationship between Simon Engineering and SAI. *Id.* While plaintiff states that it relied partly on SAI's connection with Simon Engineering in entering into the contract, it also admits that it knew that SAI was the manufacturer of the 80-foot boomlift and that, other than the one phone conversation described above, it never had any dealings or communications with Simon Engineering employees. Plaintiff's attempt to disregard Simon Engineering's corporate entity must, therefore, fail.

For the same reasons, plaintiff's contention that Simon Engineering is directly liable for its injuries is equally flawed. Simon Engineering was not a party to the contract with the plaintiff. Its employees were not involved in any alleged misrepresentations to the plaintiff. The sum of one telephone call, an internal memorandum which did not come to light until this suit was brought, and some marketing literature and representations touting the existence of an international "Simon family" is simply inadequate to confer jurisdiction over the British company, much less hold it liable for a contract to which it was not a party. *Miller*, 779 F.2d at 769.

## III. PLAINTIFF'S MOTION TO AMEND

On November 30, 1987, one month before the court-ordered discovery deadline of December 31, 1987, plaintiff moved to amend its complaint to include a count under the

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* Plaintiff charged defendants with breaches of contract and warranty and other fraudulent acts not only against itself, but against Ontario Hydro, the Philadelphia Navy Yard, Tri–Co (a New Jersey corporation), and others. The magistrate denied this motion on April 27, 1988 and plaintiff subsequently asked this court to consider and reverse the magistrate's decision. For the reasons set forth below, the court affirms the decision of the magistrate and denies the motion to amend.[7]

■ At the outset, the applicable standard of review is in some doubt. Normally the magistrate's order can be overruled only if "clearly erroneous or contrary to law." Fed.R.Civ.P. 72. However, following the magistrate's opinion and pursuant to a request from this court, the plaintiff filed a list of RICO particulars and a more specific proposed amendment than the one before the magistrate. Particularly in light of the magistrate's conclusion that plaintiff had failed to allege the predicate acts of mail and wire fraud with sufficient particularity, Magistrate's Order on Plaintiff's Motion to Amend Complaint, slip op. at 5 (D.Mass. April 27, 1988), the court deems it most prudent to review the motion *de novo.* In doing so, the court adheres to the standard that leave to amend "shall be freely given when justice so requires," Fed.R.Civ.P. 15(b), but that bad faith, delay, undue prejudice, and futility will justify denial, *Colmenares Vivas v. Sun Alliance Ins. Co.*, 807 F.2d 1102, 1108 (1st Cir.1986).

■ Several considerations make denial of the motion to amend appropriate in this case. First, plaintiff has not made a credible showing that its delay in seeking amendment was justified. Plaintiff argues that the grounds for its RICO claim did not come to light until November 16, 1987, when it took the sworn testimony of two former SAI employees. Magistrate's Order at 3. While some new evidence may have been developed in these *ex parte* in-

---

7. The court orally denied plaintiff's motion to amend at a hearing on September 21, 1989 and writes here solely to clarify its reasons for doing so.

terviews, the court finds that most of the allegations in plaintiff's statement of RICO particulars were known to plaintiff earlier than November, 1987. In particular, it is apparent from other evidence in the record that soon after the filing of its original complaint, plaintiff knew of or suspected SAI's alleged breaches of contract and warranty against Logan, Ontario Hydro and the Philadelphia Navy Yard. Of all the allegations actually supported in the record, only those concerning the Tri–Co transaction came to light later in discovery.

Second, plaintiff's motion was filed on the eve of the discovery deadline, after defendants had almost finished discovery. Its statement of RICO particulars was not filed until after this deadline had passed. Where, as here, leave to amend would require postponement of the action to allow further discovery, it may justifiably be denied. *Colmenares*, 807 F.2d at 1108.[8]

Third, plaintiff's RICO claim would fundamentally expand the scope of these proceedings, from a dispute over the breach of a single contract to one concerning allegedly illegal activity stretching from Wisconsin across Massachusetts, Pennsylvania, New Jersey and Ontario, Canada. Allowing the motion would not only be prejudicial to the defendants, but would seriously undermine the efficiency of the court. On the other hand, denying the motion does not strip the plaintiff of any relief to which it should be entitled. In this case, plaintiff could have recovered as much under chapter 93A as under RICO had it survived the motion for summary judgment and eventually prevailed at trial. Under such circumstances, denial of the motion to amend cannot be deemed "unjust." Fed.R.Civ.P. 15(b).

## IV. CONCLUSION

In view of the foregoing, it is hereby ORDERED that:

1. Plaintiff's motion to amend its complaint is DENIED.

2. Plaintiff's motion for partial summary judgment is DENIED.

3. Defendants' motion for summary judgment is GRANTED. Judgment shall, therefore, be entered for defendants.

---

**8.** While plaintiff requests only 90 days to perform further discovery, this figure does not con-template any additional time which defendants may need to prepare *their* case.